COMMONWEALTH vs. PHILIP J. GAGLIARDI.

Middlesex. September 11, 1985. — January 21, 1986.

Present: GRANT, CUTTER, & PERRETTA, JJ.

*Homicide. Practice, Criminal,* New trial.

Based upon the cumulative effect of several prosecutorial errors during a murder trial, together with the judge's consideration of the testimony and the demeanor of the key prosecution witness, the judge was warranted in concluding that "justice may not have been done and that the interests of justice require a new trial," where it appeared, by the judge's assessment, that the prosecutor's opening statement, although later amended, presented an unwarranted picture of cruelty and deliberation which negated carelessness or recklessness as the cause of the homicide; that certain facts, including some bearing on the credibility of the key prosecution witness, had not been disclosed to the defendant in a timely manner; and that the prosecution, notwithstanding evidence of the defendant's intoxication, had pursued a verdict of murder in the first degree in order to enhance the likelihood of a compromise verdict of murder in the second degree, which was the verdict the jury returned. [443-449]

INDICTMENT found and returned in the Superior Court Department on January 17, 1984.

The case was tried before *Hiller B. Zobel,* J., and a motion for a new trial was heard by him.

*James W. Sahakian,* Assistant District Attorney, for the Commonwealth.

*William A. Bolton* for the defendant.

PERRETTA, J. After a jury found the defendant guilty of the murder in the second degree of Donald Kingsley Costello, he brought a motion for a new trial under Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979), which was allowed by the trial judge on the ground that "justice may not have been done and that the interests of justice require a new trial." The trial judge gave

detailed and comprehensive reasons in explanation of his ruling on the motion. The Commonwealth appeals, alleging that these reasons are the result of the judge's "application of law to clearly erroneous facts" and constitute an abuse of discretion. Our review of the record indicates that there is "evidence to support the judge's decision to order a new trial." *Commonwealth* v. *Preston*, 393 Mass. 318, 324 (1984). We affirm.

I. *The Evidence at Trial.*

Numerous witnesses testified at trial, but, as will be seen, the Commonwealth's case against the defendant depended upon the testimony of Paul Mullis, Jr., an immunized witness. Mullis and the defendant had known each other for some years, and Mullis had sold cocaine for the defendant in the two months prior to Costello's death on December 12, 1983.

On December 11, 1983, Mullis was tending the bar at the American Legion Post 45 (post) in Medford. The defendant arrived there at 9:30 P.M. Although he had been drinking prior to his arrival at the post, he was not intoxicated. However, while at the post, the defendant fell considerably under the influence of alcohol and drugs (cocaine). He was argumentative and clumsy, bumping into tables and twice being careless with a gun he was carrying in his coat pocket.

When the post closed at 12:40 A.M., the defendant was unable to drive. He was assisted to the front passenger seat of his Cadillac. Mullis, who had the keys to the defendant's car, was going to drive the defendant to his house, and told his (Mullis's) sister-in-law to follow him in his car. Upon arriving at the defendant's house, the defendant got out of the car, stumbled about, fell to the ground, and refused to go inside. Mullis came around to help the defendant up. Once on his feet, the defendant ran back to his car, insisting that he was going to remain with Mullis.

Mullis told his sister-in-law to leave his car, to get into the Cadillac, and that he would drive her home. After dropping off his sister-in-law, Mullis set out for his father's house to give him the post keys. While waiting at a traffic light, the victim and a friend, Glen Enos, pulled alongside the Cadillac. Mullis and the victim had been close friends for years. A con-

versation ensued, and instead of going to his father's house, Mullis followed the victim back to the post parking lot, where the victim, also intoxicated, joined Mullis and the defendant in the Cadillac. Enos decided that he wanted to go home, but the Cadillac was blocking the path of his car. Mullis, the victim, and the defendant were discussing "doing" some cocaine, and Enos became impatient. An argument erupted, and the defendant got out of the car with his gun to go for Enos, but Mullis pulled him back and subdued him. Mullis moved the Cadillac, and Enos left the lot.

Mullis then drove the victim and the defendant in the Cadillac to Mullis's father's house. Only Mullis went into the house. He ate a sandwich, left the post keys, and returned to the defendant's car. With the victim in the left rear seat and the defendant in the front passenger side, Mullis drove to the defendant's house. There was more discussion about cocaine. Believing that they were all going into the defendant's house, Mullis got out of the car and walked to the back of it. As he did so, he saw the victim looking out the window. He appeared upset. The inside car light came on, and then Mullis heard gun shots. He could not say how many shots he heard, but one came through the rear window, spraying glass over him.

Afraid that the defendant was shooting at him, Mullis ran. As he was running, he threw away some cocaine that he had been carrying. In the course of his flight, he climbed a number of fences and cut his hands. Mullis circled back to a point where he would see the Cadillac. He watched for about five minutes. He saw two bodies in the car, but neither made any movement.

Mullis next ran to his house, two streets away, awakened his wife, and sent her off to relatives. He disposed of more cocaine and telephoned the defendant's house. When the defendant answered, Mullis asked if the victim was hurt. The defendant refused to talk on the telephone. Mullis went outside to see if his wife was on her way, and in the flurry of his activities, he locked himself out of his house. Returning to the defendant's house, Mullis secretly watched him running in and out of his house with trash bags; he saw no one in the Cadillac.

Mullis again ran off, this time going to the defendant's brother's house, one street away, where he left the defendant's keys. He then ran over a mile and a half to his parents' house. It was now close to 3:00 A.M. He telephoned a friend, one Domenic Marcellino, who picked Mullis up within ten minutes. As they drove around, Mullis told Marcellino that the defendant had shot the victim.

Marcellino refused to believe that the victim could be dead. He drove near to the defendant's house, but from where they were parked, neither Marcellino nor Mullis could see the Cadillac: they did not know whether the Cadillac had been moved or whether they simply could not see it from their observation point. Because Marcellino was running out of gas, they drove to a gas station, and returned to the defendant's house at about 3:35 A.M. Again, they did not see the Cadillac, but they saw that the defendant's house was on fire. They did not stop and went directly to Marcellino's house, where Mullis stayed until his wife picked him up later that morning. He was too shocked and frightened to accept Marcellino's advice that he go to the police.

In the meantime, at 3:40 A.M., the fire department responded to an alarm and went to the defendant's address. It was discovered that an accelerant had been used to start the fire which had three points of origin. The master bedroom had been ransacked. There was blood of the victim's type, AB,[1] on a porch board. The kitchen was in disarray: cabinet doors were open, trash and trash bags were strewn about the floor, and there was blood on the refrigerator. Blood was also found on the fence separating the defendant's and a neighbor's yards. The defendant's gun was found on that neighbor's pool cover.

At 7:33 A.M., the defendant's car was discovered by a Tufts University police officer who had not seen the car on his earlier patrol of the area at 3:45 A.M. The victim's body was in the left rear passenger seat. The car was littered with household trash and trash bags. There was a can of charcoal lighter fluid on the driver's side of the front seat. Four days later, Decem-

---

[1] Both Mullis and the defendant have type O blood.

ber 16, 1983, the defendant was arrested. A month later, he was indicted for murder in the first degree.

II. *Allowance of the Motion.*

The trial judge described five occurrences and their effects which led him to conclude that the defendant was entitled to a new trial.

A. *Discovery.* An autopsy was performed on the victim on December 12, 1983, from which the pathologist concluded that two bullets had entered the victim's brain, one from the right rear of the neck and the other through the nose, fracturing the orbital and nasal bones. The ballistician given the bullet fragments from the victim's brain concluded, however, that because the fragments weighed less than a single bullet, the pathologist was wrong. By mid-February, the ballistician had advised his superior officer of his view, and the prosecutor was so informed no later than February 29. On March 3, the ballistician informed the pathologist of his opinion, but the pathologist disagreed.

Although defense counsel was aware prior to trial of the weight discrepancy between the ballistician's and the pathologist's reports, he was not aware of the fact that the ballistician had told anyone that he (the ballistician) believed the pathologist was in error.

Two additional facts were not disclosed to defense counsel prior to trial. One of the witnesses informed a detective that Mullis's father had told him not to talk with anyone, including the police, about the events in question. Additionally, an examination of Mullis for occult blood on December 14 revealed that he had cuts on the knuckles of both his hands.

B. *The Commonwealth's opening statement.* In its bill of particulars filed on March 5, the Commonwealth specified that the defendant "committed the murder by shooting the victim twice in the head." Faced with the contradiction between the reports of its experts, the ballistician (one bullet) and the pathologist (two bullets), the Commowealth called in another pathologist, Dr. Katsas. On March 12, Dr. Katsas met with Dr. Sanchez, the pathologist who had performed the autopsy and who had concluded that there were two bullets in the victim's brain.

Consistent with the bill of particulars, the prosecutor asserted in his opening statement on March 19 that the victim was shot in the head twice. One shot hit him "directly in his nose," taking the "right or left part of his nostril," and this shot "was most likely a contact wound which means the gun was put to his nose and fired." Another shot was "in the back of the neck-head and that shot . . . went into his brain. Both bullets were recovered within his brain."

On March 24, a Saturday, the ballistician, the two pathologists, a State police detective, and the prosecutor and his assistant met to review the one-bullet — two-bullet controversy. Defense counsel was immediately informed of the results of the meeting. Now concluding that a bullet had "grazed" the victim's nose and was lodged in the defendant's car, the prosecution conducted a warrantless pry-apart search of the Cadillac and then applied for a search warrant.

This sequence of events was made known to the trial judge, who required the prosecutor, on the next trial day (March 26), to amend his opening. As described by the judge, the prosecution's amended opening statement was "[i]n tones perceptibly less ardent than those of his original opening." The amendment was: "It is the Commonwealth's position that there are still two wounds to the victim's head. The first wound is the same as I said in my opening statement, to the rear of the neck. However, the second wound to the victim, it will be the Commonwealth's position and the pathologist that will testify, did not enter into the actual head, but was rather a superficial or a g[r]azing wound to the nose that caused that particular damage . . . that it did not actually nor did any projectiles from that bullet actually enter the victim's head."

Dr. Sanchez's testimony is confusing. At one point he describes tracking the course of the nose bullet through the brain with a pencil; he later testifies in a manner that could easily be construed as a concession that a bullet did not pass through the victim's nose into his cranial cavity. He also testified that the fracture in the victim's nose was not caused by the bullet entering the victim's head (presumably meaning the bullet from the back) but that it had to be a projectile that struck and

broke the victim's nose bone. Dr. Katsas testified, based on his meetings with Dr. Sanchez and the ballistician and his review of the case, that he was of opinion that the nose wound was "tangential . . . from the right to left," that the bullet grazed the nose and face, never entering the victim's head, and that the nose bone "was not even involved by the bullet wound."

C. *Mullis's testimony.* It is obvious from Mullis's testimony that by reason of the events of December 11 and 12, he had much at stake. We do not think it necessary to recite his testimony in detail to appreciate the judge's assessment of Mullis's version of what happened: "An immunized witness, Mullis told a story riddled with inherent inconsistencies to a degree far exceeding that to be expected from even an extremely confused person."[2] Moreover, the judge made particular note of Mullis's "testimonial demeanor" in evaluating his testimony for purposes of ruling on the motion. He considered Mullis's "tone of voice, his body language, his constantly mopping the area of his nose and mouth with a carefully concealed handkerchief, and his admissions concerning substance-habits." Further, even though Mullis knew that all the witnesses had been sequestered and ordered not to discuss their testimony, he admitted that he had obtained information about another

---

[2] As noted by the judge, when Mullis arrived' at the defendant's house for the first time, he had the defendant's keys as well as his own car keys. Rather than leave the defendant to his own devices but without the keys to his car, Mullis got back in the car with the defendant and allowed him, in his "falling-down drunk" condition, to remain in his company. Aware of the facts that the defendant was drunk and had a gun which he had brandished earlier while drinking at the post and later at Enos in the post parking lot, Mullis made no effort to take the gun from the "stuporous" defendant. Indeed, Mullis left the victim and the defendant in the car while he went into his parents' house and ate a sandwich. When Mullis heard the gun-shot, he did not run to his parents' house to seek aid, even though he had the keys to the defendant's car and the defendant was too drunk to chase him. Instead, he threw away his cocaine and returned to the area to watch the Cadillac. Upon going to his house, he called the defendant to ask about the victim and was told not to talk over the telephone. Still, Mullis did nothing other than to return to the defendant's house secretly to watch him. Within the safety of his parents' house, he called a friend, and the two drove aimlessly about, calling neither the police nor the fire department.

witness' testimony. He could not, however, remember from whom he obtained the information or even where the conversation took place.

D. *The indictment and closing argument.* In charging the jury, the judge instructed on the elements of murder in the first and second degrees and manslaughter.[3] The prosecutor, in closing, argued to the jury that "there is plenty of evidence, absent alcohol, or deliberate premeditation." He soon thereafter stated: "[H]e took that gun and he pressed it to his nose . . . Were it not for alcohol and drugs this is a first degree murder. With the alcohol and drugs it is a second degree murder, nothing more, nothing less." All the evidence of the defendant's excessive consumption of alcohol and drugs came from the Commonwealth's witnesses, just as it had anticipated.

E. *Cumulative effect of mishaps.* The judge noted that the initial impression of the case given to the jury by the prosecutor was a "picture of cruelty and deliberation which, in a manner unsupported by the evidence, negated carelessness or even recklessness as the cause of the homicide."[4] He concluded that the amended opening, because of its timing and tone, could not remove the taint of the original statement from the jurors' minds.

Additionally, the Commonwealth's case was entirely dependent upon the jury's acceptance of Mullis's testimony. By necessity, the defendant had to attack Mullis's credibility, and hence, the "evidentiary means to do so, assumed critical importance." The judge was not unmindful of the fact that, ultimately, de-

---

[3] On the evidence presented, the manslaughter instruction was as follows: "[I]f the government proves that Mr. Gagliardi, and no one else, without any intent to kill or to injure, acted with a high degree of likelihood that substantial harm would result to some other person, that is, that he disregarded the probable harmful consequences to some other person, and that as a result of that behavior, Mr. Costello died, then the defendant would be guilty of manslaughter.

[4] The cruelty and deliberation to which the judge referred was the prosecutor's statement that the defendant put the gun to the victim's nose and fired and shot him through the back of the head. This statement, coupled with the assertion that two bullets were found in the victim's brain, creates an image more gruesome than can be supported by the ultimate testimony of Dr. Sanchez and the entire testimony of Dr. Katsas.

fense counsel had been given all the facts by the Commonwealth. But these facts (Mullis's father's statement to a witness to talk to no one, the error in the theory of a bullet through the victim's nose,[5] and the existence of cuts on Mullis's knuckles) were disclosed in the course of trial. Moreover, these facts "tended to permit the reasonable inference that Mullis and [the] victim had fought (thus accounting for the victim's fractured facial bones) and putting an entirely different light on Mullis' already tenuous account." It was the defendant's right, the judge continued, to use these facts "at his own reasonable discretion, and not to dribble them into action at the prosecution's dictation (deliberate or *de facto*)."

Last, the judge was concerned by the fact that the Commonwealth, notwithstanding its evidence of the defendant's state of intoxication, pursued a verdict of guilty of murder in the first degree. See *Commonwealth* v. *Sheehan,* 376 Mass. 765, 775 (1978); *Commonwealth* v. *Costello,* 392 Mass. 393, 405 (1984). As assessed by the judge, the Commonwealth's motive in taking such a position was to enhance a compromise on the part of the jury under which they would reach the verdict the Commonwealth had wanted all along, murder in the second degree.

Viewing the situation in its entirety, the judge concluded that the Commonwealth's "miscues," however "unfortunate and regrettable," did not constitute prosecutorial misconduct requiring dismissal of the indictment or other relief on that basis. Nor did the judge conclude that the defendant was entitled to a required finding of not guilty or a reduction of the verdict to manslaughter. See Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979). The judge, in evaluating the defendant's motion for a new trial under rule 30(b), specifically and properly put aside any personal consideration of the defendant's guilt or innocence, see *Commonwealth* v. *Markham,* 10 Mass. App.

---

[5] The importance here of timely disclosure of the facts to which the defendant was entitled was pointed out by the judge: "The Court's assessment of Mullis' testimony [see C, *supra*] and the length of the jury's deliberations [three days] suggest plainly the delicate balance of proof and the likelihood that even a slight forensic difference would radically affect the result."

Ct. 651, 654 (1980), and focused on the sole issue of "[d]id the government's Guilty verdict come only after a trial in which justice *may not* have been done?" (Emphasis original.) Based upon the above circumstances touching upon the trial "as a whole," the judge concluded that "justice may not have been done and that the interests of justice require a new trial" on so much of the indictment as alleges murder in the second degree.

III. *Discussion.*

The Commonwealth devotes much of its brief to defending unnecessarily the manner in which it proceeded on the indictment. The judge's decision was not grounded upon what the Commonwealth did or failed to do; rather, the judge's focus was on the sole issue whether justice may not have been done, for whatever reason. See *Commonwealth* v. *McCarthy,* 375 Mass. 409, 414-415 & n.5 (1978). Additionally, the Commonwealth argues that in reaching his conclusion, the judge was in error on critical facts. Our review of the record indicates that if the facts recited by the judge are not found verbatim in the transcript, they are sufficiently close so as to render his account a most reasonable interpretation of them.[6] The argument that the judge must have found the evidence of first degree murder sufficient as he did not direct a finding of not guilty on that charge under Mass.R.Crim.P. 25(b)(2), is foreclosed by the verdict and the judge's statement that he "thought it best to permit the trial to take its course, and to deal later with any questions the verdict might raise."

In reviewing the evidence and the judge's memorandum of decision, we have been mindful of the scope of our review, as recently repeated in *Commonwealth* v. *Preston,* 393 Mass. at 324: "[A]s often stated in the past, the granting of a new trial is a decision firmly committed to the sound discretion of the trial judge. See *Commonwealth* v. *Little,* 384 Mass. 262,

---

[6] As we do not agree that the facts relied upon by the judge in ruling upon the motion were clearly erroneous, we need not consider the Commonwealth's contention concerning the denial of its motion for a rehearing based upon affidavits of witnesses as to what their testimony was or what they meant it to be.

268-269 (1981); *Commonwealth* v. *Cook,* 380 Mass. 314, 320 (1980); *Commonwealth* v. *Gagne,* 367 Mass. 519, 526 (1975). The trial judge has the advantage of first-hand evaluation of the witnesses and the evidence at trial. *Commonwealth* v. *Cinelli,* 389 Mass. 197, 205 (1983). He may be aware of nuances of conduct, tone, and evidence that easily escape the cold record available to an appellate court on review. See *Commonwealth* v. *Ellison,* 376 Mass. 1, 16-17 (1978). Furthermore, it is irrelevant what the justices of this court would have done had they been in the position of the trial judge. Our task is only to ensure that there exists in the record before us evidence to support the judge's decision to order a new trial. *Commonwealth* v. *Cook, supra* at 320."

Applying this standard, we conclude that the judge did not act arbitrarily or frivolously or commit an error of law in ordering a new trial.

*Order allowing motion for new*
*trial affirmed.*