COMMONWEALTH *vs.* PHILIP J. GAGLIARDI.

No. 89-P-293.

Middlesex. October 17, 1989. - September 19, 1990.

Present: WARNER, C.J., ARMSTRONG, & CUTTER, JJ.

*Homicide. Practice, Criminal*, New trial, Disclosure of evidence, Challenge to jurors, View, Presence of defendant, Impeachment by prior conviction, Instructions to jury, Verdict. *Jury and Jurors. Evidence*, Prior conviction, Impeachment of credibility, Failure to produce witness, Prior inconsistent statement. *Constitutional Law*, Self-incrimination. *Witness*, Immunity.

At a criminal trial, the delays and omissions in the Commonwealth's responses to discovery motions were not shown to have prejudiced the defendant in the preparation and conduct of his defense nor were they demonstrated to be the result of wilful misconduct by the Commonwealth, and the defendant's motions for dismissal or mistrial on that ground were properly denied. [228-236]

The judge at a criminal trial correctly refused to recognize the defendant's attempts to exercise peremptory challenges that were not made in compliance with the procedure set forth in rule 6 of the Superior Court. [236-237]

The judge at a criminal trial properly refused to allow the defendant to board the bus taking the jurors for a view. [237]

At the trial of a murder case there was no error in the form of a question by which a prosecution witness was impeached with his prior conviction. [237-238]

At the trial of a murder indictment the judge incorrectly allowed the impeachment of a witness by reference to his exercise of his Fifth Amendment privilege not to testify before the grand jury; however, the error was not, in the circumstances, sufficiently prejudicial to require a new trial. [238-239]

Discussion of the applicability of the holding in *Commonwealth v. Ciampa*, 406 Mass. 257, 266 (1989), to the treatment at trial of testimony of an accomplice given under a grant of immunity. [240-242]

In a murder case, the judge's refusal to give a requested instruction that the jury should subject to particularly careful scrutiny the testimony of an immunized witness did not, in the circumstances, constitute reversible error. [242]

At a murder trial the judge did not err in refusing to instruct the jury on the defendant's theory of the case. [242-243]

In a murder case, the judge properly declined to give "missing witness" instructions to the jury as requested by the defendant, where the drawing of adverse inferences was not warranted in the circumstances due to the unimportance of the testimony of the two such witnesses in question. [243-244]

The judge at a criminal trial, relying on the holding of *Commonwealth* v. *Daye*, 393 Mass. 55 (1984), properly declined to give the jury a general instruction that prior inconsistent statements of witnesses might be used as substantive evidence if made under oath. [244-245]

In a murder case, the judge did not abuse his discretion in declining to reduce the verdict under Mass.R.Crim.P. 25(b)(2) from second degree murder to manslaughter. [245-246]


INDICTMENT found and returned in the Superior Court Department on January 17, 1984.

After the decision of this court in 21 Mass. App. Ct. 439 (1986), the case was retried before *James D. McDaniel, Jr.,* J.

*David Kelston* for the defendant.

*James W. Sahakian,* Assistant District Attorney (*David R. Marks,* Assistant District Attorney, with him) for the Commonwealth.

ARMSTRONG, J. Following the allowance of a new trial motion (reviewed in *Commonwealth* v. *Gagliardi,* 21 Mass. App. Ct. 439 [1986]), the defendant, represented by new counsel, was retried and was again convicted of murder in the second degree. The case is here again on his appeal from the conviction.

The facts that could be found by the jury, based (as at the first trial) principally on the testimony of Paul Mullis, Jr., are largely the same as those set out at 21 Mass. App. Ct. 440-443. In broad outline these are that the defendant, intoxicated with alcohol and possibly cocaine, left an American Legion post with Mullis at 12:40 A.M. on December 12, 1983, in the defendant's Cadillac automobile, driven by Mullis. They were joined for a time by Glen Enos and the victim, Donald Kingsley Costello, and when Enos departed, Costello remained with Mullis and the defendant in the Cadillac. They drove to the defendant's house in Medford. Mullis stepped out of the car, then fled when shots were fired inside

the car. The defendant had been carrying a revolver all evening and had been both careless with it (dropping it on the floor at the post) and increasingly belligerent (he had drawn the revolver on Enos, and he had earlier threatened Mullis and offered to "take care of" a waitress's [Jenkins's] husband for her). Having withdrawn to a safe distance, Mullis discarded cocaine he was carrying, then circled back to observe the Cadillac. He saw the two men sitting in the car motionless. Mullis then ran to his home nearby to tell his wife to leave the house and stay with relatives. He discarded more cocaine, telephoned the defendant's house (the defendant answered but refused to talk on the phone), returned on foot again to watch from a distance (the defendant was going in and out of his house with trash bags), went to the defendant's brother's house (also nearby) to return the keys to the Cadillac, telephoned a friend (Dominic Marcellino) who joined him, returned with Marcellino to observe (they did not see the Cadillac), and after getting gasoline for Marcellino's car returned again (at 3:35 A.M.) and observed the defendant's house on fire. The two went back to Marcellino's house. Mullis refused Marcellino's advice that he go to the police.

Meanwhile, fire department personnel who had responded to an alarm at 3:40 A.M. found that the fire in the defendant's house had been set, the kitchen was littered with trash and trash bags, and the bedroom had been ransacked. Blood of Costello's type (AB) was found in many places (including on the porch railing and wall and on the refrigerator). The revolver was later found on the neighbor's pool cover. (There was blood on top of the fence between the neighbor's house and the defendant's.) The Cadillac was found on Latin Way, on the Tufts University campus about a mile from the defendant's house. The rear window was shattered, with at least one visible bullet hole. Inside was a can of charcoal starter fluid and a large amount of trash. Costello's dead body with bullet wounds in the face and neck was in the left rear passenger seat. A campus policeman had not observed the car there when making his rounds at 3:45 A.M. Additional facts appear below where relevant to specific issues.

The defendant's claims of error are numerous, but they can be grouped into nine broad categories.

1. *Delays and omissions in the Commonwealth's responses to discovery motions.* Failures in this category were partly responsible for the first judge's decision to allow the defendant's new trial motion. As was pointed out in the earlier decision of this court, a defendant should have the use of discovered facts in advance of trial and not learn of them as they may be dribbled into the trial at the prosecutor's discretion. 21 Mass. App. Ct. at 447. In the first *Gagliardi* decision we were reviewing a determination by the first trial judge to allow a new trial motion. This, we pointed out, lay largely in his discretion. 21 Mass. App. Ct. at 448-449. Here we review the second trial judge's exercise of discretion not to grant any of several motions for a mistrial (or dismissal) as failures of disclosure came to light. This we do cognizant of the overriding principles that delays by the Commonwealth in disclosing evidence do not mandate retrial where the defendant fails to demonstrate that he suffered adverse consequences due to the delays, *Commonwealth* v. *Adrey*, 376 Mass. 747, 755 (1978); *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980); *Commonwealth* v. *Gregory*, 401 Mass. 437, 443 (1988), and that a dismissal of the charges is not normally warranted except in those cases where the nondisclosures or late disclosures are "deliberate and intentional," *Commonwealth* v. *Light*, 394 Mass. 112, 114 (1985), or where the delay has irremediably harmed the defendant's opportunity to obtain a fair trial, *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 314 (1984). See generally *Commonwealth* v. *Light*, 394 Mass. at 115-116 (Liacos, J., dissenting), and *Commonwealth* v. *Cronk*, 396 Mass. 194, 198-200 (1985).

a. The Campbell statement and tape. On the third day of testimony (September 28, 1987), counsel for the defendant announced that he had information to the effect that the Commonwealth was in possession of a police report of a taped interview of January 5, 1984, with one Mark Campbell and that the report and tape were not among the materials that had been turned over to the defense in response to court

orders. An overnight search turned up the missing report of the interview but not the tape, which was not located until after the trial. (The report was found by the judge to be a substantially verbatim transcription of the tape.) The significance of the interview is said to be that it indicated that there was a fourth person in the defendant's car on the night of the murder, one MacNeill, Mullis's brother-in-law who, if not himself the murderer, was possibly a witness to it and a conspirator in a plot to frame the defendant.[1]

The defense theory — one that had to be developed through other witnesses because the defendant did not testify — was that by 1:30 A.M. at the latest, Mullis, driving the defendant's car (with the defendant in the front passenger seat and Costello, the victim, in back), dropped the defendant at his house, Mullis retaining possession of the keys and the car; that the defendant's son Paul picked the defendant up shortly thereafter and drove him to Scarborough, Maine, to the home of the defendant's son Philip, Jr., and his wife; that they arrived there at about 3:00 A.M. (according to one DiSanto, Philip, Jr.'s father-in-law) or perhaps 3:30 A.M. (according to Paul); and that the defendant, thus, was not in Massachusetts when the murder, according to Mullis's story, was taking place.[2] Knowledge of the presence of MacNeill in the car, the defendant argues, might have enabled him to adduce (presumably through MacNeill) evidence contradicting Mullis's false claim that the defendant was the killer.

Mark Campbell was commander of the American Legion post in December, 1983, and was there when the post was closed up the night of Costello's murder. In prior statements, including his testimony at the first trial in 1984, he had

[1] Contrary to the defendant's contentions on appeal, we do not read the Campbell statements in that interview as asserting that MacNeill admitted being present at the shooting or at the fire. We also note that Campbell's assertion that Paul "Red" Mullis, Sr., was telling various persons not to volunteer statements to the police came out at the first trial. See 21 Mass. App. Ct. at 443.

[2] Through physical evidence and expert testimony the defendant sought also to establish that the shooting took place in the early morning hours, after 3:45 A.M., at the place where the Cadillac was found on the Tufts campus.

stated that Mullis and the defendant drove off together, in the defendant's Cadillac, sometimes indicating that they were alone, at other times indicating that he didn't know whether additional persons might have been in the Cadillac. The January 5, 1984, statement differed from the prior statements in that it indicated that MacNeill left the post in the Cadillac with Mullis and the defendant. Upon receiving the 1984 report, defense counsel had his investigator interview Campbell, who reiterated that he thought MacNeill was part of the group that left the hall together at closing and that he "saw" MacNeill get into the Cadillac or (two sentences later in the investigator's report) that he "assumed" MacNeill got into the Cadillac. Later in the trial (on October 22, 1987), the defendant called Campbell as a witness, and Campbell took the position that he had not *seen* MacNeill get into the Cadillac but assumed he had done so because the group that closed the post left in two cars. (There was no dispute that the car in which Campbell left, Mullis's, was driven by Mullis's sister Kathy and had no other passengers.) MacNeill himself, although available to both sides (see part 7, *infra*), was never called as a witness.

After trial the judge made findings with respect to the circumstances of the late production of the report and the nonproduction of the tape. He concluded that the Commonwealth had been negligent but that it had not deliberately or wilfully suppressed the report or the tape. He also found that the delays had not prejudiced the defendant in the preparation and conduct of his defense.[3]

---

[3]"[A]fter the trial concluded, the prosecutor located the missing microcassette recording of Campbell's . . . statement. (The circumstances under which the micro-cassette was located are set forth in the [affidavits] of [the Assistant District Attorney]. . . . The court finds no reason to discredit the circumstances outlined in the . . . affidavits.) Defendant was afforded the opportunity to listen to the . . . recording.

. . . .

"While it is clear . . . that greater care and diligence on the part of the Commonwealth would have produced both the transcript and the micro-cassette for defendant's use prior to trial, I do not conclude that those materials were deliberately and wilfully suppressed. The Commonwealth was negligent, but I do not find that it acted in bad faith.

"I further conclude that the delay in providing defendant with a copy of

However unfortunate the delay in production may have been, the judge was justified in concluding that it did not impair the defense. The trial went on for nearly another month. The defendant was thus in a position to investigate the alleged MacNeill involvement, even if only by interviewing MacNeill himself. So far as the present record shows, the MacNeill information leads nowhere except to impeach Campbell (defense counsel used it to this end), whose testimony fundamentally was not important.[4] There was testimony from several sources (including Campbell) that Campbell was himself inebriated by closing time, and his recollections may have been clouded for that reason. There was much evidence that MacNeill had left the post earlier in the evening and that Michael Grealy was the additional person present at the closing. Grealy, who lived a few doors down the street, testified that he did not get into either car but walked home. Neither Kathy Mullis nor Grealy saw a third person enter the Cadillac, and Enos, who was Costello's friend, and who described in detail the events that occurred after he and Costello joined up with Mullis and the defendant, was similarly silent about the presence of MacNeill or any other third person in the defendant's Cadillac. Finally, the judge could properly reflect that, if a third person was in fact present in the Cadillac (or, after Costello entered it, a fourth person), that fact and the identity of that person was presumably known to the defendant himself, who, at that

the Campbell transcript did not cause him to be prejudiced in his defense. . . . After defendant was provided the . . . [s]tatement he had ample opportunity to interview Campbell and investigate his claims. . . . [D]efendant was amply prepared to examine Campbell, who did not testify for . . . several weeks after disclosure of the . . . transcript."

[4]Campbell was scheduled to be the first prosecution witness but was bypassed when (according to the prosecutor) he appeared for trial in a condition of questionable sobriety. MacNeill was apparently available. He appeared on a potential witness list for the second trial but was not called. (MacNeill was not likely to be called as a Commonwealth witness because, on its theory of the case, MacNeill had left the post well before the start of the events that culminated in Costello's death.)

stage of the evening, was apparently intoxicated but hardly unconscious.

b. Other delayed reports. During the trial the defendant's counsel repeatedly moved for dismissal based on late production (at trial) of in excess of twenty witness statements that he claimed to have been entitled to receive before trial based on a pretrial conference report. Many of these were the handwritten notes or statements that were the bases for typed or formal reports that the defendant *had* received before trial. Some showed minor discrepancies (e.g., the original handwritten report of Enos's statement, Mullis's handwritten statements, the original report of Captain Murphy of the Medford fire department, and other fire department reports and diagrams, including Deputy Fire Chief Curtis's handwritten report[5]) that seem relatively inconsequential. The defendant had apparently received the ballistician's report but not the file of notes upon which it was based. The F.B.I. autopsy report was supplied to the defendant in a different form from that produced at the trial, but it is not suggested that the content was materially different. There were several differences between the fingerprint expert's written report (produced at the first trial), a letter of amendment thereto (identifying a print on one of the Cadillac window controls as Mullis's), which was given late to the defendant but still well before the start of the second trial, and the fingerprint expert's handwritten notes, not produced until he testified at the second trial. Here, counsel disagreed about whether the conference report required the Commonwealth

[5]Differences between Curtis's handwritten notes and report and his typewritten report that had been furnished to the defendant earlier were said by the defendant to be relevant to a suppression motion that had been denied (in part) by the first trial judge in 1984. The defendant asks that we remand the case for reconsideration of the suppression motion. We decline to do so because the defendant did not ask the second trial judge to reopen and reconsider the suppression motion. The discussion in the transcript of October 6, 1987, concerning the 1984 suppression motion related to a motion made by the defendant for a mistrial or for dismissal based on late production of these and other written notes. The denial of the suppression motion in 1984 was given as an example of possible prejudice, but the defendant did not seek reconsideration of the denial.

to produce the handwritten notes — a dispute that underlay many of the allegations of late production. The judge sided with the prosecutor's reading, which seems correct to us[6]; in any event, the judge was not required to find either wilful misconduct by the Commonwealth or prejudice to the defense.

The same can be said of the statements made to investigating officers by Michael Grealy, Pauline Hogan, and Mullis's wife; those statements presumably were reduced to written reports, but the reports could not be located. No effort was made to call Mullis's wife or Pauline Hogan as witnesses. Their testimony would have been of corroborative value only. The former could verify (or not) that Mullis had packed her off to the home of a relative (around 2:00 A.M.) when he thought that the defendant might try to pursue and kill him; the latter (Pauline Hogan) could only confirm or deny that her boyfriend (Marcellino) had received a telephone call at around 3:00 A.M. and in response had left the house. Grealy, who *was* called as a witness, could not recall what he might have told the investigators four years before. It would be pure speculation to say that his statements then would have contradicted his testimony at trial.

It is worthwhile to reflect that, while the defendant can point to a seemingly large number of late or lost reports (if handwritten notes are included), the Commonwealth in fact turned over to the defendant something in the order of one hundred thirty reports generated by five investigating departments (the State Police, the Medford and Somerville police departments, the Medford fire department, and the Tufts University campus police), as well as several specialized units (the State Fire Marshal's office, the F.B.I. crime laboratory). This does not count hundreds of additional photographs and

---

[6]In this court the defendant relies primarily on discovery motions filed by the defendant's first counsel in advance of the first trial. The transcript shows that the judge in the second trial was looking to the pretrial conference report prepared in advance of the second trial as defining the Commonwealth's discovery obligations. So far as we can find, the defendant did not direct the judge's attention to the 1984 discovery motions, which had broader wording. See note 9, *infra.*

documents that were made available. Against this background, the judge could reasonably decline to credit the defense accusation of deliberate withholding of evidence.[7]

c. Jenkins's change of testimony. At the second trial Mariann Jenkins, who had acted as a waitress at the post the night of Costello's death, identified a pair of eyeglasses as those the defendant had been wearing that night. The eyeglasses had been found in the defendant's bedroom in the burned house; the significance of Jenkins's testimony was that it supported an inference that the defendant had returned to his bedroom between the time of his arrival home from the post and the time of his departure for Scarborough, Maine, and had been the one who ransacked the bedroom.[8]

The defendant complains that he should have been advised that Jenkins would change her testimony from the first trial, where she had been unable to identify the glasses as those the defendant had been wearing. The testimony at the two trials, however, was not so dissimilar as the defendant suggests. At both trials Jenkins said the glasses looked like those the defendant had worn. At the first trial she declined to make a positive identification, because the glasses shown at trial were lacking a lens, and because she remembered the tint (these were glasses that darkened on exposure to light) as being darker. At the time of the second trial, although she made at one point a positive identification, when pressed she reiterated that she couldn't say positively, she could only say they looked like the ones worn earlier, except for the missing lens. Her testimony was at best cumulative. A stronger identification of the glasses was given by Michael Grealy, who described the incident outside the Legion hall that caused the

_____

[7]Because the defendant has demonstrated neither that the judge clearly erred in concluding that he was not prejudiced by the delayed disclosure of the Campbell statement nor that adverse consequences attended the delayed disclosure of the other materials, we need not decide whether these materials were exculpatory and whether the defendant specifically requested them. See *Commonwealth* v. *Gregory, supra* at 443. See generally *Commonwealth* v. *Gallarelli,* 399 Mass. 17 (1987).

[8]The prosecutor argued that he must have been looking for keys to move the Cadillac (Mullis having fled with one set).

glasses to lose a lens. In all the circumstances the Jenkins's testimony and the change therein did not have the significance that the defendant attaches to it.

d. Mullis's change of testimony. At the second trial Mullis testified that, when he restrained the defendant's assault on Enos, the defendant was holding in his left hand the revolver used to kill Costello. Before the grand jury and at the first trial, Mullis had testified that he was unable to remember which hand held the revolver. The point was of relevance because the defendant was later to put in evidence the opinion of an expert to the effect that Costello's killer probably held the murder weapon in his left hand. (The defendant was right-handed; Mullis was left-handed.)

The change of testimony could be thought of limited significance. The defendant, when restrained, was sitting in the front passenger seat of the Cadillac and was opening the door with, presumably, his right hand, which would seem to be reason enough for his holding the revolver at that moment in his left hand. If, however, we accept the defendant's contention that the change of testimony was crucial, we nevertheless find in the defendant's argument to the judge no source of a duty on the Commonwealth's part to disclose the change of testimony in advance of trial. The pretrial conference report, relied on by the judge, called for the production of written or recorded statements of the defendant; relevant written or recorded grand jury testimony; facts of an exculpatory nature; relevant physical evidence and documents; names and addresses of proposed witnesses with dates of birth; and "statements" of witnesses, which was defined (by reference to Mass.R.Crim.P. 14[d], 378 Mass. 881 [1979]) to include writings or recorded statements but not unrecorded oral declarations. The defendant's remedy lay in cross-examination, which was vigorous and skillfully em-

ployed by the defendant's counsel to cast doubt on Mullis's veracity.[9,10]

2. *Restriction on defendant's peremptory challenges.* After the Commonwealth had declared itself satisfied with the jurors, the judge called on the defendant to exercise his peremptory challenges. Defense counsel challenged those jurors, saying, "That's all for now." The three vacant seats were filled with new jurors found to stand indifferent. Defense counsel then attempted to challenge (or "back-challenge") jurors other than the three replacement jurors. The judge correctly refused to recognize those challenges. Peremptory challenges are governed by rule 6 of the Superior

---

[9] In this court, as mentioned in note 5, *supra,* the defendant argues that the Commonwealth had a duty to disclose the changes of testimony based on discovery motions allowed before the first trial, one of which called for exculpatory evidence, including "any and all statements of such witnesses, which the Commonwealth . . . know[s] . . . are in any way different from what the Commonwealth now understands that the trial testimony of its witnesses will be" (this was not violated; the defendant had the transcripts of the grand jury testimony and the first-trial testimony), and another which called for "statements and reports of witnesses," including "any and all oral statements subsequently reduced to writing and oral statements not reduced to writing of all persons the Commonwealth intends to call as witnesses herein." The question whether the latter imposed on the Commonwealth a duty to report a change in one detail of a witness's testimony was not addressed to the judge and is thus not properly relied on in this court, except as it may have amounted (it did not) to a miscarriage of justice. Even if the Commonwealth was obligated to inform the defendant of these changes of testimony, the failure to do so was nonprejudicial. Defense counsel effectively cross-examined both witnesses. See *Commonwealth* v. *Gilbert,* 377 Mass. 887, 894-896 (1979). See also *Commonwealth* v. *Cundriff,* 382 Mass. 137, 148-151 (1980), cert. denied, 451 U.S. 973 (1981); *Commonwealth* v. *Costello,* 392 Mass. 393, 397-400 (1984); *Commonwealth* v. *McLeod,* 394 Mass. 727, 740-744, cert. denied sub nom. *Aiello* v. *Massachusetts,* 474 U.S. 919 (1985).

[10] We have not separately discussed the change in Enos's testimony, which related to the reasons he gave for denying (in the immediate aftermath of the crime) his involvement that evening with Costello, the defendant, and Mullis. At the first trial, he said he had been afraid of losing his post office job (he did lose it). At the second trial, he said he was in fear for his life (as well as not wanting his family to know of his involvement with cocaine and his fear of losing his job). After studying the testimony, we see no reason to suppose that the prosecution was likely aware of the change before it occurred. Enos was effectively cross-examined on the inconsistency.

Court (1974), *Commonwealth v. Brown*, 395 Mass. 604, 606 (1985), and that rule requires that a party "shall at one time exercise his right of peremptory challenge as to [the indifferent] jurors, and after others have been called to take the places of those challenged, and it has been determined that they stand indifferent in the case, shall at one time exercise his right of challenge of such others," the last referring to the replacement jurors. See *Commonwealth v. Ptomey*, 26 Mass. App. Ct. 491, 494 (1988); Smith, Criminal Practice & Procedure § 1720 (2d ed. 1983 and Supp. 1990).[11]

3. *Precluding the defendant's attendance at the view.* Without prior notification the defendant appeared with his counsel as the jurors were boarding a bus for a view. The judge refused to allow the defendant to board. This, the defendant claims, humiliated him in the jurors' eyes and prevented him from assisting his counsel. Generally in this Commonwealth a defendant is not present at a view. *Commonwealth v. Dascalakis*, 246 Mass. 12, 31 (1923). *Commonwealth v. DiMarzo*, 364 Mass. 669, 674 (1974). In light of this practice, a defendant should not assume that the judge will permit his attendance and show up without prior permission. A defendant is not entitled of right to confer with his counsel during a view. *Commonwealth v. Curry*, 368 Mass. 195, 197-199 (1975).

4. *The impeachment of Joseph Gagliardi.* Mullis testified that he had the keys to the defendant's Cadillac when he fled from the scene of the shooting and that he delivered the keys sometime after 2:00 A.M. to the defendant's brother's house, leaving them with a nephew of the defendant. There were

---

[11]Because this was a capital case, the parties were allowed extra challenges, see Mass.R.Crim.P. 20(c)(1), 378 Mass. 890-891 (1979), and it is arguable that the judge could have restricted the right of peremptory challenge to require that they be exercised individually as to each juror. Compare *Commonwealth v. Barry*, 397 Mass. 718, 726·(1986), and *Commonwealth v. Freiberg*, 405 Mass. 282, 291-293 (1989), with *Commonwealth v. Ptomey*, 26 Mass. App. Ct. at 492 n.2. Nothing in these decisions suggests, however, that the judge was required to liberalize the procedures of rule 6 to allow back challenges. A judge, in other words, does not err in hewing strictly to the procedure set out in rule 6. (Rule 6 was amended in 1989, but the amendment did not change the language quoted in the text.)

two such nephews, each of whom testified that he was home that night and that Mullis did not come to the house or leave the keys. One of those, Gennaro, was not cross-examined. The other, Joseph, was impeached by reference to prior silence and by a prior conviction. The latter was raised in this form: Are you the same Joseph Gagliardi who on (date) was charged with assault and battery on a police officer and on (date) you pled guilty to so much of that charge as constituted assault and battery? This form was faithful to the record, and it was not error for the judge to permit it. *Commonwealth* v. *Connolly*, 356 Mass. 617, 626-627, cert. denied, 400 U.S. 843 (1970). *Commonwealth* v. *Millyan*, 399 Mass. 171, 184-185 (1987). The better practice is to limit the reference to the conviction alone. *Id.* at 184. The reading of the charge, however, does not make the case analogous to *Commonwealth* v. *Ford*, 397 Mass. 298, 300 (1986), where a conviction was reversed because the jury were apprised of the defendant's "defaults, warrants issued, arrests on warrant, and violations of probation."

It was error, however, to permit Joseph Gagliardi to be impeached by reference to his refusal to answer questions before the grand jury, where he claimed the Fifth Amendment privilege on his lawyer's advice. "Because the impact of a witness's refusal to testify outweighs its probative value, '[i]t is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." *Commonwealth* v. *Hesketh*, 386 Mass. 153, 157 (1982), quoting from *Bowles* v. *United States*, 439 F.2d 536, 541 (D.C. Cir. 1970), cert. denied, 401 U.S. 995 (1971). See *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 80 (1978). The prior claim of privilege was not in any sense a prior statement inconsistent with the witness's trial testimony, nor did it have a tendency to show recent contrivance.[12]

---

[12]The foundation requirements for showing recent contrivance are set out in *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981). See *Commonwealth* v. *Mahan*, 18 Mass. App. Ct. 738, 743-744 (1984).

We think the error was not sufficiently prejudicial to require a new trial. More serious prejudice would arise from impeaching a defendant through his own prior claim of privilege or from suggesting, in violation of G. L. c. 278, § 23, that the defendant at prior hearings failed to offer evidence in his own behalf. See *Commonwealth v. Cefalo*, 381 Mass. 319, 337-338 (1980); *Commonwealth v. Morrison*, 1 Mass. App. Ct. 632, 635-636 (1973). The judge attempted to remove any invidious associational taint (see *Commonwealth v. Martin*, 372 Mass. 412, 413 [1977]) by requiring that no reference be made to the grand jury or to the claim of Fifth Amendment privilege, although this well-meaning effort may have been of dubious value.[13] In the last analysis, however, Joseph Gagliardi's testimony was one detail only in a complicated web of evidence, a detail as to which there was another, unimpeached witness.[14,15]

---

[13]The impeachment evidence was structured as a "conversation" between an assistant district attorney and the witness, in which Joseph Gagliardi was asked whether he was home on the night of the incident and did not give an answer to the question "at that time." The defendant's counsel thought it best to bring out on redirect examination that Joseph Gagliardi claimed the privilege on the advice of his lawyer, thus obviating any suggestion of recent contrivance.

[14]The defendant tends to magnify the importance of this detail by treating as given that there was only one set of keys to the Cadillac, a set which was presumably in the murderer's (or any accessory's) possession when the Cadillac was moved from the defendant's house to the Tufts campus. The jury, however, were not required to believe that there was only one set of keys and could properly have concluded that the defendant (or an accessory) moved the car even if Mullis retained a set of keys.

[15]The other alleged evidentiary errors are without merit. The defendant's expert witness sufficiently impeached Mullis's "shattered glass" testimony when he gave his opinion that the window glass formerly comprising the bullet hole would have been pulverized into a fine powder. The point was adequately made without evidence as to how far the powder would travel. The question to Detective Vokey was properly excluded as calling for totem pole hearsay. Compare *Commonwealth v. Barras*, 3 Mass. App. Ct. 43, 46-47 (1975). The suggestion on appeal that the answer was admissible for a nonhearsay purpose (namely, to question the integrity of the investigation, *Commonwealth v. Bowden*, 379 Mass. 472, 485-486 [1980]), was not advanced to the judge. The requested recall of Detective Vokey lay in the judge's discretion, *Commonwealth v. Shaw*, ante 39, 42 (1990), as did the request for the fingerprint expert's notes.

5. *Denial of request for instruction on special scrutiny of immunized testimony.* The defendant was denied an instruction that the jury should subject to particularly careful scrutiny the testimony of an immunized witness. In light of *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), which had not been decided at the time of the trial in this case, it would have been better if the judge had given such an instruction. Nevertheless, in the circumstances of this case, we think that the refusal of the judge to do so was not reversible error.

It has been generally thought in our practice that such an instruction is not mandatory. Analogy can be drawn to the testimony of accomplices, see *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 728-729 (1973), where the general rule is that " '[a] trial judge may tell the jury to scrutinize the testimony of an accomplice with care, especially when the testimony is not corroborated . . . [but he] is not required to do so.' " *Commonwealth* v. *French*, 357 Mass. 356, 396 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972), quoted in *Commonwealth* v. *DeBrosky*, at 729. The general rule (as to accomplices) was reviewed and adhered to in *Commonwealth* v. *Watkins*, 377 Mass. 385, 388-390 (1979). To the same effect, see *United States* v. *Wright*, 573 F.2d 681, 685 (1st Cir.), cert. denied, 436 U.S. 949 (1978); *United States* v. *Olmstead*, 832 F.2d 642, 647 (1st Cir. 1987), cert. denied, 486 U.S. 1009 (1988); *United States* v. *Newton*, 891 F.2d 944, 949 (1st Cir. 1989).

In *Commonwealth* v. *Ciampa, supra*, a conviction was reversed because of errors in the treatment of a plea agreement, pursuant to which an admitted accomplice to a murder and other crimes charged against the defendants, in return for testifying truthfully against the defendants, was promised a lenient sentence recommendation (twelve to twenty years in State prison). The agreement was put in evidence by the Commonwealth in its case-in-chief, and it was emphasized to the jury on at least eight discrete occasions (as the appellate record shows) that the accomplice's agreement with the

Commonwealth depended entirely upon the truthfulness of his testimony. The plea agreement went to the jury in its deliberations. A separate writing, signed by the accomplice's attorney, "in effect indicat[ing] that he believed [the] accomplice was telling him the truth" (406 Mass. at 262), was put in evidence (although it did not go to the jury room). The prosecutor emphasized in closing argument that the accomplice must tell the truth or lose the benefit of his agreement with the Commonwealth. This course of action, objected to at many stages by the defendant, was held, in effect, to have permitted the Commonwealth (as well as the accomplice's own attorney) to vouch for the truthfulness of the accomplice's testimony. By way of guidance for future cases, the court emphasized that a truth-telling condition of a plea agreement should not be put in evidence in the Commonwealth's direct examination of its accomplice-witness (at 262-264), that it might come in on redirect in response to the defendant's impeachment of testimony elicited by plea bargain (at 264), that it should not be drummed home by undue repetition (at 262, 264), and that a trial judge should offset references to the truth-telling condition by "specifically and forcefully tell[ing] the jury to study the witness's credibility with particular care" (at 266).

What was said in the *Ciampa* case concerning accomplice testimony pursuant to a plea agreement applies, although with somewhat diminished force, to testimony of an immunized witness — diminished, perhaps, because the truthfulness condition applicable to the immunized witness, that he is not protected from prosecution for perjury, G. L. c. 233, § 20G, applies in a sense equally to all witnesses, whether immunized or not, and because the truthfulness condition of a plea agreement such as that in *Ciampa* contemplates an affirmative determination, after the accomplice has testified and before he has been sentenced, whether he has told the truth. The implication of vouching can nevertheless be present with immunized testimony and should be offset in a degree commensurate with the danger.

The preferable course for dealing with the immunized witness would be to exclude mention of the truthfulness condition until redirect examination, when it may be brought out to rebut the contention that immunized testimony is inherently suspect, and to offset reliance on the truthfulness condition as a mark of veracity by cautioning the jury to scrutinize the immunized testimony with particular care. See *Commonwealth* v. *Ciampa*, 406 Mass. at 266, citing *United States* v. *Sims*, 719 F.2d 375, 378 (11th Cir. 1983), cert. denied, 465 U.S. 1034 (1984), with the notation, "trial judge dispelled any suggestion of vouching by instructing the jury to keep in mind that testimony given pursuant to an immunity agreement 'is always to be received with caution and weighed with great care.'"

In this case, the prosecutor brought out by a single question and answer the witness's (Mullis's) understanding that he could be prosecuted for false testimony despite the grant of immunity, and he referred to that fact once in his closing argument. No objection was taken to bringing out the truthfulness condition in Mullis's direct examination. The sole objection was to the judge's refusal to give a cautionary instruction in his final charge to the jury.

It would have been better if the judge had done so. Nevertheless, we have in this case none of the emphasis (by constant repetition) on the witness's truthfulness that was held reversible error in *Ciampa*. The references were brief and were offset in practical effect by the defendant's assault on Mullis's credibility. The jury were made aware that Mullis had asserted his privilege against self-incrimination before the grand jury and that he had lied to officers of several police departments before he was granted immunity. The defendant's trial strategy was to depict Mullis both as the center of a plot to frame the defendant, and quite possibly, as himself the murderer. In these circumstances, we think it doubtful that the jury would fail to scrutinize Mullis's testimony carefully unless they were told to do so.

6. *Denial of request for instruction on defendant's theory of the case.* There was no error in the judge's refusal to in-

struct the jury on the defendant's theory of the case (i.e., that Mullis was framing the defendant who was not in Massachusetts when the murder took place). His theory had been articulated forcefully by the defendant's attorney. *Commonwealth* v. *Murray*, 396 Mass. 702, 709-710 (1986). "It is for the judge to decide to what extent he will state the evidence and discuss the possible inferences of fact that may be drawn from it." *Commonwealth* v. *Polian*, 288 Mass. 494, 499 (1934). "It is to be noted, on the one hand, that the defendant was to some extent merely negating the propositions of fact as tendered and sought to be proved by the prosecution, and a negative does not lend itself readily to illustration; on the other hand, any references to the defendant's theory of the case must steer clear of the shoal of intimating that the jury must accept that theory in order to acquit him." *Commonwealth* v. *Therrien*, 371 Mass. 203, 206 (1976). The Massachusetts cases relied on by the defendant concern specialized instructions that are required in particular circumstances: *Commonwealth* v. *Mills*, 400 Mass. 626 (1987)(instruction required on subject of criminal responsibility despite lack of expert testimony that defendant was insane); *Commonwealth* v. *Grey*, 399 Mass. 469, 470-472 (1987)(instruction required on effect of mental impairment on defendant's ability to form the requisite specific intent); *Commonwealth* v. *Delrio*, 22 Mass. App. Ct. 712, 719-721 (1986)(instruction required where requested on possibility of honest but mistaken identification).

7. *Denial of request for missing witness instruction.* The judge did not err in refusing the defendant's request that he give "missing witness" instructions to the jury. The defendant had argued to the jury, without objection, that they could draw adverse inferences from the Commonwealth's failure to call as witnesses Mullis's wife (to confirm that Mullis awakened her the night of the killing and had her move to the house of a relative) and Pauline Hogan, Marcellino's girlfriend (to confirm that Marcellino had received, as he testified, a call the night of the murder and had left the house). The judge is not obliged to give such an instruction without

regard to the importance of the witness to the case. "There is no basis for any such inference when it appears that the testimony would be unimportant — merely corroborative of, or merely cumulative upon, the testimony of one or more witnesses who have been called." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). *Commonwealth* v. *Fulgham*, 23 Mass. App. Ct. 422, 426 (1987). Hogan's testimony could properly be thought in this sense, unimportant, potentially corroborating (or not) a detail in the testimony of a witness who was not a participant in (or observer of) the crime and whose evidentiary function was principally to corroborate the testimony of Mullis.

Where Mullis's veracity was so directly under attack, however, his wife's testimony, more directly corroborative than Hogan's, was not so unimportant that its absence would provoke no questions. The prosecutor explained the reason, however, for her reluctance to testify, a fear of intimidation by persons related to the defendant (the Mullis house apparently had a police guard during the trial); and the judge could balance the reason for her reluctance to testify against the objective importance of her testimony in the case. It is the judge's role, in the first instance, to determine whether an inference adverse to the non-calling party is warranted in the circumstances explained by counsel. *Commonwealth* v. *Fulgham*, 23 Mass. App. Ct. at 426. "[If] satisfied that the circumstances thus offered would, in ordinary logic and experience, furnish a plausible reason for nonproduction," 2 Wigmore, Evidence § 290 (1979), the judge should decline to give a missing witness instruction. *Burgess* v. *United States*, 440 F.2d 226, 237 (D.C. Cir. 1970)(Robinson, J., concurring), quoted with approval in *Commonwealth* v. *Schatvet*, *supra* at 135 n.11. *Commonwealth* v. *Fulgham*, *supra* at 426. The determination called for is an exercise of judgment, reversible only if manifestly unreasonable. Here it was reasonable.

8. *Denial of request for instruction on substantive use of prior inconsistent statements.* The judge, who gave a general instruction that prior inconsistent statements of witnesses

should be considered only as bearing on the credibility of their trial testimony, correctly declined to give a generalized instruction that the jury might use them substantively if they were given under oath. The defendant's objection was based on *Commonwealth* v. *Daye*, 393 Mass. 55 (1984). As the judge correctly pointed out, however, the *Daye* case sanctions substantive use of prior inconsistent statements only subject to restrictions that, as a practical matter, require consideration of such use on a statement-by-statement basis. See 393 Mass. at 73-75, and, in particular 74 n.21, which suggests that counsel desiring to introduce a prior inconsistent statement for its full probative effect should ask for a voir dire, so that the judge may consider the substantive admissibility of the statement in relation to the conditions laid out in that case. The generalized instruction sought here would have served only to confuse the jury. It was correctly refused.

9. *Reduction of verdict.* After the trial the defendant sought a reduction of the verdict from murder to manslaughter, based on the allegedly overwhelming evidence that the defendant was so intoxicated by alcohol and cocaine the night of the killing as to be incapable of forming the requisite intent to kill Costello or to do him grievous bodily harm. The defendant's elaborate efforts immediately after the killing to conceal it (as the jury could find) tend to belie the contention that he was not then capable of ordered thought or purposeful behavior. The jury could properly find that he was not (as the defendant argued) "comatose" but was instead sullen, hostile, and recklessly aggressive, showing by his behavior repeatedly through the night of December 11 and 12 his willingness to expose others to risk of death or serious bodily harm. The force needed to work the "heavy trigger pull" of the murder weapon (a compact off-duty police, or "COP," model .38 special and .357 magnum caliber pistol) was thirteen and one-half pounds; three shots were fired. The murder may have been pointless, but so are many murders. The fact that an act of violence is irrational does not mean it is not intentional. A motion for reduction of a verdict under Mass.R.Crim.P. 25(b)(2), 378 Mass. 896

(1979), is addressed to the discretion of the judge. There was no abuse of discretion here.

The defendant had a long, thorough, and fair trial. The errors we have noted did not, in our view, affect the integrity of the fact-finding process. "A defendant is entitled to a fair trial, but not a perfect one." *Lutwak* v. *United States*, 344 U.S. 604, 619 (1953). *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. 241, 246 (1978).

*Judgment affirmed.*