Zobel, J.
MEMORANDUM
The law, John Adams told a Massachusetts jury-while defending British citizens on trial for murder, is inflexible, inexorable, and deaf: inexorable to the cries of the defendant; “deaf as an adder to the clamours of the populace.” His words ring true, 227 years later. Elected officials may consider popular urging and sway to public opinion polls. Judges must follow their oaths and do their duty, heedless of editorials, letters, telegrams, picketers, threats, petitions, panelists, and talk shows. In this country, we do not administer justice by plebiscite. A judge, in short, is a public servant who must follow his conscience, whether or not he counters the manifest wishes of those he serves; whether or not his decision seems a surrender to the prevalent demands.
1. Pertinent Evidence.
Reduced to its appropriately bare essentials, this case turns on diametrically opposed theories of ultimate causation. Both sides agreed that Matthew Eappen died from massive intracranial bleeding. The prosecution’s experts attributed the hemorrhage to a combination of extraordinarily violent shaking and overpowering contact with a hard flat surface, all occurring some time on February 4, 1997; the defense experts ascribed the hemorrhage to a “rebleed” in a clot formed about three weeks earlier following a hitherto undetected injury.
The government buttressed the scientific evidence with testimony that the baby had been normal earlier in the day; that Defendant had been the only adult in his presence throughout; and that she had admitted to police that she had been “a little rough” with him when putting him on a bed, bathing him, and placing him on the bathroom floor.
The defense relied for rejoinder entirely on the testimony of Defendant herself, who denied handling the child in an inappropriately vigorous manner, although she admitted that perhaps she had “not been as gentle as I might have been” with Matthew.
Thus stripped of the jargon-filled overlay with which both sides filled the record, the issue for the juiy’s determination was simply: Did the government prove beyond a reasonable doubt that Matthew Eappen died because Defendant shook him and battered him against an unyielding object? Put another way: Did the defense evidence create a reasonable doubt that the death resulted from some other cause?
2. Motion for a Required Finding of Not Guilty.
It is essential to understand that at no time was Defendant obliged to prove anything. The jurors were never required to choose between competing explanations. If the government’s theory failed to win them over, beyond a reasonable doubt, their inquiry was complete; the defense’s inability (if inability it was) to explain Matthew’s injuries and their cause would make no difference.
The law never, in any way, demanded of Defendant that she provide a jury-satisfying answer to any question, whether medical (how old was the fatal hemorrhage?) or physical (what had Defendant done to Matthew?).
Thus a verdict of Guilty could not properly result from the jury’s merely rejecting the defense’s physiological explanation as inadequate or Defendant’s version of the events as implausible. The jury could return a Guilty verdict only if, in addition to an adverse assessment of the defense position, the jurors concluded, on all the evidence, that the prosecution’s version was true, beyond a reasonable doubt.
To escape reasonable doubt in the present case, a jury would have to disbelieve all the evidence contradicting the government’s hypothesis. The jury would have to dis-credit, that is, refuse to accept, the combined conclusions of the defense witnesses.
Given the strength of the defense evidence, could the jury lawfully reject it? Most certainly. As judges always tell juries — as this judge told this jury — evidence is evidence if the jurors believe it; what they choose not to believe is not evidence.
Although application of this principle would mean that the jury spurned, as not worthy of belief, professional opinions emanating from a corps of highly-qualified, authoritative experts, such dismissal is unquestionably within the jury’s province.
Now for purposes of deciding Defendant’s Motion for a Required Finding of Not Guilty, the law requires our assuming that the jury did indeed discard every scrap of evidence (testimonial or visual, direct or *450 circumstantial) tending to cast doubt on the prosecution’s theory.
Measuring the evidence by this strict standard, my duty inescapably mandates my denying the motion in its entirety. Whatever my own views of the evidence might or might not be, I cannot, in deciding this Motion, place any of them upon the scales.
3. Motion for a New Trial.
A judge may not grant a new trial merely because had he been the factfinder the case would have come out differently. In stating this truism, of course I do not suggest any disagreement with the verdict as delivered. In any event, the offense charged did not allow a test of the hypothesis, since the defendant in an indictment for first-degree murder cannot elect a juryless trial.
The verdict, it seems to me, was not against the weight of the evidence. In reaching this conclusion, I have considered each of Defendant’s specific contentions:
a. The government certainly should have discovered the so-called “skull fracture photographs” earlier and given them to the defense well before the start of trial. The late disclosure, although inexcusable, did not prevent effective presentation of the evidence and its significance; that is the legal test, Commonwealth v. Lam Hue To, 391 Mass. 301, 309 (1984). In this connection it is worth noting that because the Court denied the Commonwealth’s proffer of rebuttal evidence, the recalled defense witness, Dr. Michael Baden, offered the last word on the photographs and the conclusions to be drawn from them. Moreover, the defense was afforded ample opportunity to exploit the entire matter in closing argument.
Tucceri v. Commonwealth, 412 Mass. 401 (1992), is not to the contrary; among other things, the jury there never saw the exculpatory evidence. Similarly, in Commonwealth v. Gagliardi, 21 Mass.App.Ct. 439 (1986), the Commonwealth’s misconduct was egregious and involved evidentiary culpability by the prosecutor much more prolonged and extensive than the government’s performance here.
Finally, in Commonwealth v. Lam Hue To, supra, the assistant district attorney himself concealed the evidence from the defense after having learned of its existence well before trial, and compounded the misbehavior by deliberately misrepresenting the situation to the trial judge.
b. Whether a recent fracture would have demonstrated soft tissue swelling was a matter on which the experts disagreed; that does not equate with the right to a new trial.
c. The “serum” evidence does not mandate a new trial. Absence of a contemporaneous transcript of Dr. Jan Leestma’s testimony — a normal occurrence in the Massachusetts Superior Court, and not to be held against the faithful, dedicated court reporter— necessitated either not responding to the jury’s request, or interrupting deliberations of a sequestered jury for the time necessaiy to transcribe the testimony (which had lasted for parts of two days). The alternative, preparing a transcript of only selected portions, was not possible here, where counsel could not agree on the selections. Even if they had agreed, the delay would have held the jury idle an unacceptably long time.
Thus in accordance with the normal practice in Superior Court trials, the transcript was not read. Unless one or both of the parties make arrangements for daily transcripts, none is available. Here, defense had caused the transcription of Dr. Joseph Madsen’s testimony, but not Dr. Leestma’s. When the juiy asked for the former, no reason existed why it should not be read; Defendant, in fact, agreed that the jury should receive it. The lack of a Leestma transcript was, from the defense standpoint, unfortunate. However, here again, nothing prevented counsel, in final argument, from putting to the jurors his own recollection and urging them to draw the appropriate conclusion.
d. Dr. Leestma’s neuropathology findings came before the jury in full, illustrated detail. Absence of the dura was disputed at trial; the jury was entitled to believe that nothing substantial was gone. In this, the Court’s previous contrary findings, made in a different proceeding and context, do not control.
e. Dr. Alisa Gean’s testimony may have tended to prove the age of the hematoma; it did not, as Defendant argues, prove the point.
f. Similarly, the ophthalmological evidence as to the state of the retinas is at best (from the defense standpoint) inconclusive.
g. Contrary to Defendant’s contentions, the Court plainly told the jury to confine its inquiry to the events of February 4 and told the jury that the Commonwealth was obliged to prove that Defendant acted intentionally (albeit that she lacked intent to kill). It is settled law that under the definition of “malice” which the Commonwealth pursued here, a person can be guilty of second-degree murder even absent an intent to kill or even an intent to harm, so long as the Commonwealth proves: (a) an intentional act (b) which in circumstances known to the defendant (c) created what a reasonably prudent person would have known was (according to common experience) a plain and strong likelihood that death would result.
h. Defendant incorrectly states that criminal liability for homicide depends on proof that brain death preceded withdrawal of life support. The test in this Commonwealth is not the order of the events, but whether or not Defendant’s act was the direct cause *451 of Matthew Eappen’s death. On that, the Court’s instructions to the jury were explicit.
i. The test for malice (in the circumstances here) is whether, under the circumstances known to Defendant, a reasonable person would have known that her intentional act created a substantial risk of death to Matthew Eappen. This test has long been the rule in Massachusetts. As Chief Justice Oliver Wendell Holmes noted almost a centuiy ago, “it is possible to commit murder without any actual intent to kill or to do grievous bodily harm,” Commonwealth v. Chance, 174 Mass. 245, 252 (1899). The only intent the government need prove is the intent to perform the act, not any particular intent as to the act’s consequences.
j. The effect of pretrial publicity on the jurors was the subject of a searching, prophylactic empanelment procedure, complete with special questionnaires and individual interrogation of prospective jurors. All the jurors seated satisfied the Court and counsel that neither the publicity nor any other cause had affected their individual ability to decide the case entirely on the evidence. The publicity gives no cause for a new trial.
k. The evidence in this case sufficed, however thinly, to support an indictment alleging extreme cruelty and atrocity. Whether obtaining the indictment in that form was wise or compassionate is not for the Court to say at this time. Unlike Commonwealth v. Gagliardi, supra, at 446, where the prosecutor, during the trial, conceded a lack of evidence to support a conviction for first-degree murder, the prosecution consistently urged first-degree murder, and the medical evidence here permitted that stance.
l. The government’s closing argument was tough, but eminently fair. Indeed, throughout the trial the prosecution team — like the defense — acted in accordance with the highest professional standards.
A judge may grant a new trial “for any . . . reason that justice may require,” G.L.c. 278, §33E, which blends with Rule 25(b)(2), see Reporter’s Notes. Under all the circumstances, I do not think that justice requires a new trial.
4. Motion to Reduce Verdict.
Even though the Court declines to allow a new trial, a very serious issue remains as to the justice of the second-degree murder verdict the trial produced. The inquiiy here is quite different from what has gone before.
In seeking a directed acquittal or a new trial, Defendant argued that the evidence as to causation so strongly raised a reasonable doubt as to liability for Matthew Eappen’s death that the conviction could not stand. Now Defendant urges a reduced assessment of her culpability, relying upon Massachusetts Rule of Criminal Procedure 25(b)(2):
If a verdict of guilty is returned, the judge may on motion . . . order the entry of a finding of guilty of any offense included in the offense charged in the indictment.
The test here is no longer narrowly legal. The judge, formerly only an umpire enforcing the rules, now must determine whether, under the special circumstances of this case, justice requires lowering the level of guilt from murder to manslaughter (or even to battery). The facts, as well as the law, are open to consideration, Commonwealth v. Jefferson, 416 Mass. 258, 266 (1993).
In deciding this issue, the judge must, above all, use the power sparingly, Commonwealth v. Dalton, 385 Mass. 190, 197 (1982), and with restraint, Commonwealth v. Williams, 364 Mass. 145, 151 (1973), taking care not to act arbitrarily or unreasonably, Commonwealth v. Cobb, 399 Mass. 191, 192 (1987). The judge does not sit as a second jury, Commonwealth v. Little, 35 Mass.App.Ct. 949 (1994) (rescript), or even as a thirteenth juror, Commonwealth v. Carter, 423 Mass. 506, 512 (1996); he should not second-guess the jury, Commonwealth v. Millyan, 399 Mass. 171, 188 (1987). Nonetheless, he is entitled to consider testimony that the jury may have disbelieved, see Commonwealth v. Keough, 385 Mass. 314, 320 (1982), including such of Defendant’s own testimony as he finds credible, id. at 321.
Because Rule 25(b)(2) is a kind of safety valve, Commonwealth v. Cole, 380 Mass. 30, 38 (1980), a means of rectifying disproportionate verdicts, Commonwealth v. Gaulden, 383 Mass. 543, 556 (1981), the test is not whether the evidence could support a verdict of second degree murder, but whether a lesser verdict more comports with justice, Commonwealth v. Ghee, 414 Mass. 313, 321 (1993).
After considering the law and the evidence of the. whole case “broadly,” Commonwealth v. Mahnke, 368 Mass. 662, 702n. (1975), to determine whether “there was any miscarriage of justice,” id., the judge’s duty requires: weighing “the fundamental fairness of the result,” Commonwealth v. Ravida, 371 Mass. 243, 249 (1976); deciding whether a reduced verdict would be more consonant with justice, Commonwealth v. Ghee, supra, at 321; and determining whether justice “will be more nearly achieved” by a reduction, rather than by allowing the jury’s verdict to stand, Commonwealth v. Baker, 346 Mass. 107, 119 (1963).
In short, the court may reduce the level of the conviction, for any reason that justice may require. This in turn means that the judge must decide whether failing to reduce the verdict raises a substantial risk that justice has miscarried, Commonwealth v. Shelley, 381 Mass. 340, 349-50 (1980). The scope of review may be even broader than requiring Defendant to show “grave prejudice” or “substantial likelihood” that a miscarriage of justice has occurred, Commonwealth v. Cole, supra, at 38.
*452 Rule 25(b)(2) applies ameliorative justice on a case-by-case basis. Its use — designedly rare — thus does not erode established criminal-law principles.
The Court may not, however, take into account the feelings of those the death has affected; the judge must focus entirely on the events of the trial. Thus although as a father and grandfather I particularly recognize and acknowledge the indescribable pain Matthew Eappen’s death has caused his parents and grandparents, as a judge I am duty-bound to ignore it. I must look only at the evidence and the defendant.
Having considered the matter carefully, I am firmly convinced that the interests of justice — as Rule 25(b)(2) and the cases construing it have defined them — mandate my reducing the verdict to manslaughter. I do this in accordance with my discretion and my duty.
Viewing the evidence broadly, as I am permitted to do, I believe that the circumstances in which Defendant acted were characterized by confusion, inexperience, frustration, immaturity and some anger, but not malice (in the legal sense) supporting a conviction for second degree murder. Frustrated by her inability to quiet the crying child, she was “a little rough with him,” under circumstances where another, perhaps wiser, person would have sought to restrain the physical impulse. The roughness was sufficient to start (or restart) a bleeding that escalated fatally.
This sad scenario is, in my judgment after having heard all the evidence and considered the interests of justice, most fairly characterized as manslaughter, not mandatory-life-sentence murder. I view the evidence as disclosing confusion, fright, and bad judgment, rather than rage or malice, see Commonwealth v. Gaulden, supra, at 555.
One further point requires attention. Defense counsel vigorously urged, and the government with equal vigor opposed, my denying the jury an opportunity to consider the verdict of manslaughter, a decision which I based on Commonwealth v. Pagan, 35 Mass.App.Ct. 788, 792 (1997); Commonwealth v. Roberts, 407 Mass. 731, 737 (1990). Today the positions are reversed. The defense seeks a reduction to manslaughter; the government decries allowing Defendant a second opportunity.
Had the manslaughter option been available to the jurors, they might well have selected it, not out of compromise, but because that particular verdict accorded with at least one rational view of the evidence, namely: (1) Matthew did indeed have a preexisting, resolving (i.e., healing) blood clot; (2) Defendant did handle him “roughly”; (3) the handling (although perhaps not the roughness) was intentional; (4) the force was, under the circumstances, excessive,.and therefore unjustified; (5) the handling did cause rebleeding; and (6) the rebleeding caused death.
If the jury determined that those were the facts, the combination would amount to an unjustified, intentional, unconsented-to touching (i.e., a battery) which resulted in death. Manslaughter is simply a fatal battery, Commonwealth v. Campbell, 352 Mass. 387, 397 (1967). Defendant’s lack of intent to cause death or even injury would have been, legally speaking, irrelevant, as would Defendant’s lack of knowledge about Matthew’s preexisting condition. The principle is simple: If you apply force to another person’s body, you take the risk that (unknown to you) your blow, which an ordinary person could physically tolerate, may kill the individual you strike. The victim’s hidden physical weakness does not exonerate the perpetrator.
No one, of course, doubts that had the Court denied Defendant’s request, and had the jury convicted of manslaughter, defense counsel would be arguing that the jurors had unfairly compromised, see Commonwealth v. Pagan, supra, at 792. It seems, then, at first glance unfair that Defendant should be able to escape the consequences of a decision by her experienced lawyers which she personally and publicly approved.
In fact, it is not unfair. I do not criticize counsel’s advice and Defendant’s adopting it. Given the state of the evidence, it was a rational, appropriate position. Had it succeeded, the defense would be hailed for courage and foresight.
Should Defendant now be permitted to second-guess herself and her lawyers? If one regards the trial of a criminal case as a high-stakes game of chance where losers must accept their losses, the answer is, Certainly Not.
Massachusetts, however, never has and does not now view Justice as a handmaiden to Tyche, the Goddess of Good Fortune. Of course chance plays a part in litigation, as it does in every aspect of life. A court, nonetheless, is not a casino. The only institutionalized luck in a courtroom is the random selection of the jury venire at the beginning of trial and the random choice of alternate jurors at the end.
Rule 25(b)(2) requires a judge to view the entire case with a clear and steady eye. The search is not for justice, but rather for that rare collection of circumstances, the grave failure of justice. If leaving the verdict untouched would preserve a miscarriage of justice, Rule 25(b)(2) makes the judge’s duty clear. He must determine the existence of the miscarriage, not its cause.
After intensive, cool, calm reflection, I am morally certain that allowing this defendant on this evidence to remain convicted of second-degree murderwould be a miscarriage of justice.
One final word. All of us — the prosecution, the defense, the Court, and the public — -owe deep gratitude to the jury here, deliberating jurors and alternates alike, who gave of their time and effort and, in the aftermath, their privacy. Neither they nor anyone *453 else should interpret today’s decision as in any way a criticism of them. The decision rests, as it should, entirely on my determination, guided by my reason, my conscience, and the established precedents and principles, that the interests of justice are best served here by my exercising my informed discretion and lowering the degree of guilt attributable to Defendant.
ORDER
It is Ordered that the sentence imposed herein, October 31, 1997 be, and the same hereby is, Vacated; and it is
Farther Ordered that the verdict of Guilty, Murder in the Second Degree, returned October 30, 1997 be, and the same hereby is, reduced to Guilty, Involuntary Manslaughter, and it is
Further Ordered that Defendant be brought before this Court Monday, November 10, 1997, at 3 o’clock in the afternoon, then and there to receive her sentence on the verdict as reduced.