Billings, A.J.
On August 1, 2003, after a two week trial, a jury returned verdicts of guilty on charges of felony motor vehicle homicide, operating under the influence, and operating to endanger. Before me is the defendant’s motion, under Mass.R.Crim.P. 25(b)(2), for (a) a required finding of not guilty, or (b) a reduction to the lesser included offense of misdemeanor vehicular homicide on ground of operating to endanger. For the reasons that follow, the defendant’s motion is DENIED.
FACTS
At about 1:00 p.m. on September 1, 2001 thirteen-year-old Evan Holofcener was riding his bicycle on or beside Farmers Row (Route 111), Groton, when he was struck head-on by a pickup truck traveling in the opposite direction. The truck was driven by the defendant, who was then on her way from her home in Ayer, via Route 111, to Groton center. Evan died of his injuries later that afternoon. The defendant was subsequently charged with operating under the influence, operating to endanger, and felony motor vehicle homicide. [1]
It was the Commonwealth’s theory of the case that the defendant, who had been prescribed a number of medications including diazepam (Valium), lorazepam (Ativan), and oxycodone (Percocet), was under the influence of at least one, and that her truck veered out of her lane of travel and onto the sidewalk where Evan was traveling. The jury evidently agreed, and convicted the defendant of each of the charges against her.
*142 The verdict of felony motor vehicle homicide (G.L.c. 90, §24G) required findings by the jury both that the defendant operated her vehicle negligently or recklessly so that the lives or safety of the public might have been endangered, and that she was under the influence of an intoxicating substance (on the Commonwealth’s theory, a scheduled narcotic or depressant). See Note 1, supra. The evidence as to each of these findings is therefore reviewed in turn.
A. Evidence of Operating to Endanger
No third party witnessed the accident. Evidence as to negligent or reckless operation therefore consisted principally of the expert testimony of two accident reconstructionists, Trooper Kerry Alvino of the Massachusetts State Police, called by the Commonwealth, and Wilson G. Dobson, P.E., called by the defendant.
No lengthy review of either expert’s testimony is necessary here, except to say that Trooper Alvino opined, based on the physical evidence which she reviewed the afternoon of the crash and on methods and formulae commonly used in accident reconstruction, that the point of impact was well onto the sidewalk immediately adjacent to the defendant’s lane of travel, and that the truck therefore must have left the roadway and traveled on the sidewalk.[2] Mr. Dobson opined that the physical evidence was insufficient to determine, with a reasonable degree of scientific certainty, the location of the impact. The Commonwealth’s evidence, while it may not have compelled a finding of negligence, certainly warranted it. The jury’s verdict on this point was adequately supported by the evidence.
B. Operating Under the Influence
The “operating under” element of the OUI (G.L.c. 90, §24) and vehicular homicide (c.90, §24G) statutes require, for a conviction, that the defendant have been operating her motor vehicle “while under the influence of intoxicating liquor, or of marijuana, narcotic drugs, depressants or stimulant substances, all as defined in [G.L.c. 94C, §1], or the vapors of glue.” As noted above, the Commonwealth contended that the defendant was under the influence of one or more of three prescription medications: diazepam (sold under the brand name Valium), lorazepam (Ativan), or oxycodone (Percocet) (referred to herein collectively as the “scheduled medications"). The first two are depressants; the last, a narcotic.[3]
There was no direct evidence as to when the defendant had last taken any of the scheduled medications; nor was there medical evidence (e.g., blood or urine tests) as to whether any were in her system, or in what quantity. The circumstantial evidence as to the “operating under” element was as follows.
1. CVS Pharmacy records.
CVS Pharmacy records for the period May 26, 2001 and September 27, 2001 showed that the defendant had filled prescriptions for the scheduled medications on the following dates:
DIAZEPAM (Valium)
Date Dosage Quantity
7/17/01 5 mg. 60
9/11/01 5 mg. 60
9/24/01 5 mg. 30
LORAZEPAM (Ativan)
Date Dosage Quantity
7/02/01 1 mg. 28
7/11/01 1 mg. 28
8/31/01 2 mg. 28
OXYCODONE with APAP (Percocet)
Date Dosage Quantity
8/29/01 15
The CVS records also showed prescriptions for the following medications, among others:
TOPAMAX
Date Dosage Quantity
7/2/01 25 mg. 30
7/21/01 25 mg. 30
8/17/01 25 mg. 30
8/17/01 9/7/01 100 mg. 100 mg. 15 30
EFFEXOR
Date Dosage Quantity
8/17/01 75 mg. 30
8/28/01 75 mg. 45
9/20/01 75 mg. 45
ZYPREXA
Date Dosage Quantity
8/17/01 7.5 mg. 15
9/20/01 5 mg. 30
Although there was evidence (see below) that the latter three medications may affect driving ability, none is a controlled substance, or otherwise falls within the OUI and vehicular homicide statutes. Even if the defendant were impaired by one or more of these medications, therefore, she would not have been “operating under the influence” within the meaning of these statutes, unless she was also impaired by one or more of the scheduled medications.
2. Testimony of Dr. Abela
The CVS records further showed that the oxycodone prescription which the defendant filled on August 29 was written by Dr. Andrew Abela. Dr. Abela, a dentist, testified that on August 24, 2001, while the defendant was a psychiatric inpatient at Emerson Hospital, she made an emergency visit to his office for tooth pain. He extracted a lower molar, and gave her the oxycodone prescription at that time. His practice is to recommend to patients that if they experience pain, they should first tiy ice, then Motrin, then Vicodin or Percocet (both narcotic analgesics);[4] that they should use the minimum narcotic needed to control pain; and that they should not drive if they have taken a narcotic because it can cause drowsiness. He further testified that patients who have had a tooth extracted sometimes experience “diy socket” three to five days after the procedure, which can cause pain to flare up at that time. Extraction of a lower tooth, and smoking following the procedure (the defendant is a smoker), both place the patient at increased risk for diy socket.
*143 3. Package Warnings
The CVS records included copies of the “monographs” that CVS, when filling a prescription, produces and staples to the bag containing the pill bottle. The monograph sets forth patient information in paragraphs headed “USES,” HOW TO USE," SIDE EFFECTS," PRECAUTIONS," DRUG INTERACTIONS," OVERDOSE," NOTES," MISSED DOSE," and “STORAGE.” Each monograph is lengthy (about half of an 8 x 11 page of fairly small type). The following are excerpts from the monographs for the scheduled medications:
BENZODIAZEPINES — ORAL
(distributed with diazepam)
SIDE EFFECTS: This medication causes drowsiness and dizziness. Avoid tasks requiring alertness. Other side effects may include: stomach upset, blurred vision, headache, confusion, depression, impaired coordination, change in heart rate, trembling, weakness, memoiy loss, hangover effect (grogginess), dreaming or nightmares . . .
LORAZEPAM
SIDE EFFECTS: This drug can cause drowsiness, dizziness, lack of coordination, grogginess, headache, nausea, dry mouth, blurred vision. If these effects continue or become severe, contact your doctor. Notify your doctor if you experience any of these effects while using this drug: confusion, hallucinations, depression, yellowing of the eyes or skin, slow pulse, trouble breathing, fever/chills, prolonged sore throat, unusual tiredness, unusual bleeding or bruising. If you notice other effects not listed above, contact your doctor or pharmacist.
PRECAUTIONS: . . . Use caution when performing tasks requiring alertness . . .
OXYCODONE
SIDE EFFECTS: This medication may cause constipation, stomach upset, lightheadedness, dizziness, drowsiness, nausea, or flushing. If any of these effects persist or worsen, contact your doctor or pharmacist promptly. Tell your doctor immediately if you have any of these unlikely but serious side effects: loss of coordination, confusion, irregular heartbeat, slow/irregular breathing, anxiety, tremors . . .
PRECAUTIONS: . . . Use caution when performing tasks requiring alertness such as driving or using heavy machinery.
4. Evidence as to Therapeutic and Side Effects
As outlined below, with the exception of oxycodone (a narcotic pain medication), the other scheduled and the three unscheduled medications are all prescribed in the management of various psychiatric conditions and/or insomnia. In recorded statements she gave to the police on September 2 and 6, 2001 (both of which were played for the jury), the defendant stated that she had undergone a miscarriage on May 19 of that year; suffered from post-traumatic stress disorder; and had twice attempted suicide (most recently on August 21, which had resulted in her admission to Emerson Hospital’s psychiatric unit from then until the 29th). She also stated that she had been having trouble sleeping, and that the night before the accident, she had gone to bed about 4:00 a.m., rising about 9:00 a.m.
The Commonwealth’s medical expert (Dr. Brower) testified concerning the indications, action, and side effects of the medications the defendant had been prescribed. Of the scheduled medications:
Oxycodone (Percocet) is a narcotic analgesic, derived from the opium plant and used for moderate to severe pain. Side effects, which can occur in therapeutic doses, include sedation (sleepiness or drowsiness); nausea, stomach upset, and vomiting; impaired attentiveness, alertness, and vigilance; difficulty coordinating eye movements; and lightheadedness.
Diazepam (Valium) is an a benzodiazepine prescribed for anxiety and sometimes for insomnia. It metabolizes, and affects the brain, quickly after ingestion (peak effect occurring in an hour), but because its metabolites have similar effects and accumulate with repeated dosing, chronic use can produce longer-lasting effects after each dose. Side effects, which can occur in therapeutic doses, include: impairment of cognitive and motor functions, especially fine motor coordination; confusion and problems with thinking; drowsiness and lassitude; dizziness, lightheadedness, and poor coordination.
Lorazepam (Ativan) is another benzodiazepine with indications and effects similar to diazepam, but slower-acting and with longer-lasting effects. Side effects, which can occur in therapeutic doses, include impairment and slowing down of mental and motor functions, and drowsiness. A single dose can affect the patient for up to 24 hours. Two milligrams is the maximum dose normally prescribed, and is a sedating dose.
Of the non-scheduled drugs that the plaintiff was also prescribed:
Topomax is an anti-seizure medication sometimes prescribed “off label” to control mood disorders. Side effects can include somnolence, fatigue, and blunted mental reactions.
Effexor is an antidepressant, also used in generalized anxiety disorder. Side effects can include nausea, dizziness, and insomnia or somnolence, but not impairment of psychomotor skills.
Zyprexa is used to treat severe insomnia. Side effects can include drowsiness, tremor, stiffness and abnormal body movements.
*144 Generally speaking, the three scheduled medications produce quick relief of acute symptoms. Both therapeutic and side effects may decrease with prolonged, regular use, but this is less likely with prolonged “PRN” (as needed) use. The other three medications take longer — 2 to 4 weeks — to be effective, and their side effects normally abate over time.
Dr. Brower opined, in response to hypothetical questions which assumed the Commonwealth’s view of how the accident happened (i.e., that the truck left the roadway for the sidewalk), that such things as difficulty keeping a vehicle on a straight course, delayed reaction time, and reacting to an emergency erratically or at the last minute, are consistent with the effects of the three scheduled drugs. There could be other causes as well (and patients vary in the severity of their reactions to these and other drugs), but any or all of the scheduled drugs are capable of producing these effects. Topomax, Zyprexa, and (especially) Effexor, however, are less potent, and much less consistently associated with these kinds of impairments, than are the scheduled drugs.
5.Defendant’s Statements Concerning Medications
The plaintiff made various statements, shortly after the accident, concerning the medications she was taking. In chronological order:
Ricardo Alcantara, who happened on the scene just after the accident and helped the plaintiff out of her truck, testified that the defendant told him she was on multiple medications; that she opened her purse and showed him “quite a few bottles”; and that he overheard her tell an EMT who responded that she was on six medications.
Adam Blumenthal, who appears to have been the EMT to whom Alcantara referred, testified (with the aid of his report) that the defendant told him she was on Effexor, Topamax, Ativan, and Zyprexa.
Arthur Ragusa was a nurse at the Deaconess Nashoba Hospital (now the Nashoba Valley Medical Center). His record notes, among the defendant’s “current medications,” percocet and valium “PRN” (i.e., as needed). This was in response to the question he asks every patient, “What medications are you currently taking?”
In her September 2, 2001 and September 6, 2001 recorded statements to the Groton Police, the defendant said she had taken her medications the morning of the accident. She stated that she had not driven, or been out of the house, for two weeks prior to the accident (excepting her stay on a locked floor at Emerson Hospital). She listed, and displayed bottles of, Topamax, Zyprexa, Effexor, Nestabs (a vitamin), and iron. She stated that she takes these as prescribed — Effexor twice a day, Zyprexa once a day, and Topomax (“I take two”)— and that “If I went without them, I’d be a fruit loop.”[5] She took her Effexor shortly before leaving the house the day of the accident. She said that the packaging for Topamax, Zyprexa, and Effexor advised caution when operating heavy machinery, but that she had felt OK to drive on September 1. She never mentioned diazepam, lorazepam, or oxycodone in her statement to the police.
6.Descriptions of the Defendant’s Affect
Five witnesses testified as to the defendant’s affect, as it bore on the question of possible impairment from drugs.
1. Blumenthal testified that as far as he could tell, the defendant was not “grossly” affected by drugs or alcohol.
2. Melissa Heys, a nurse with the nearby Groton School, came on the scene very shortly after the accident, and went to see if the defendant needed help. She assessed her for head injury, and noted that she appeared alert, not drowsy, able to focus, oriented, unimpaired in speech, and able to follow the directions of the EMTs.
3. Steven Mickle, with the Groton rescue squad and a first responder, testified that the defendant appeared alert, oriented, and able to follow instructions and to respond to his questions.
4. Dr. Balser, who saw the defendant at Deaconess Nashoba, noted her to be alert and oriented “times 3" (i.e., oriented to person, place and time). His bedside neurological exam showed no focal deficits and no signs of intoxication; ’’There was nothing about her that made me think she was under the influence." He therefore saw no indication for performing a toxicology screen (but would not have performed one even if he had; since she had already admitted to taking Ativan and Percocet, the presence of these substances in a blood or urine sample would have been uninformative).[6]
5. On the other hand, Officer Hatch, a Groton Police officer (since retired) who was among the first responders, testified that he saw the defendant at the scene; that he has known her since she was a little girl; and that in his opinion, she was under the influence of something. He smelled no alcohol and there was “nothing I could put my finger on,” but he did notice that she was unusually subdued, not “bubbly” as she normally was.[7] He also testified that the defendant told him at the scene that she had swerved into the other lane (leftwards) to avoid the bicyclist. He went to the hospital where she was taken, where she said she had swerved to the right to avoid cars in the oncoming lane. Hatch asker her if she remembered telling him she had swerved to the left; she said she did not.
7.Erratic Driving
There was also the evidence of the defendant’s erratic driving the day of the accident. As mentioned above, there was evidence from which the jury could *145 have concluded that the accident occurred when defendant’s vehicle left her lane of travel and swerved onto the sidewalk, into the path of the oncoming bicyclist, for no apparent reason: the pavement was dry; the weather was clear; she was heading north and not into the sun; the road took a gradual curve to the left where the defendant drove off it to the right; and the jury could have discredited her statements both that she swerved right to avoid cars and that she swerved left to avoid the bicyclist.
There was also testimony from two witnesses who, the jury could have found, encountered the plaintiff minutes before the accident, between a mile and two away. The defendant was coming from her home in Ayer, northbound on Route 111 (known as Groton School Road in Ayer and Farmers Row in Groton), to Groton Center (with a brief stop to drop off a video at a friend’s house on the way). George Krusen and Barry Curcio, who were driving together south on Route 111 in Ayer, encountered a truck coming toward them, driven by a woman at a high rate of speed in the opposite (northbound) lane. As they and the truck approached one another at a curve in the road, the truck swerved into their lane and beyond, into the dirt by the (wrong) side of the road. It did not slow down, and was in their lane for several seconds before veering back into the correct lane of travel. Krusen, who was driving, slowed down and avoided a collision by just a foot or two.
In her September 6 statement to the police, the defendant stated that the only significant event on her drive from Ayer to Groton was that her sandal “fell off once” in the general area of the incident described by Krusen and Curcio; that she might have swerved slightly; but “then that was fine.”
Both men generally described the truck and driver,[8] and both, at the request of the Groton police, viewed the truck after the accident at the garage where it had been towed. Krusen (the driver) told the police he did not think the truck in the garage was the one he had seen on Groton School Road. Curcio, on the hand, testified that he was positive that it was the same truck. The time, place, and descriptions of the encounter were such that the jury would have been warranted in concluding that the driver was the defendant, and that her near-miss with the Krusen-Curzio vehicle took place just before the accident with Evan Holofcener.[9]
DISCUSSION
A. Renewed Motion for Required Finding
The defendant moved for a directed finding at the close of the Commonwealth’s case. At that point, as required, I reviewed “whether the evidence presented up to the time of a motion for a directed verdict [was] legally sufficient to permit the submission of the case to the . . . jury, to decide the innocence or guilt of the accused.” Commonwealth v. Latimore, 378 Mass. 671, 676 (1979). I determined that although the evidence that the defendant was under the influence of any of the scheduled medications at the time of the accident was entirely circumstantial, there was enough to warrant submitting the case to the juiy.
The defendant has now renewed her motion, requiring me (a) to look again at whether the Commonwealth’s case was sufficient, and (b) “to determine whether the Commonwealth’s position as to proof had deteriorated since it had closed its case.” Commonwealth v. Basch, 386 Mass. 620, 622 n. 2 (1982). Both determinations require that I view the evidence in the light most favorable to the Commonwealth. Latimore, 378 Mass, at 677-78; Commonwealth v. Torres, 24 Mass.App.Ct. 317, 323-24 (1987).
fflhe critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . [The] question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Thus, to sustain the denial of a directed verdict, it is not enough ... to find that there was some record evidence, however slight, to support each essential element of the offense; [there must have been] enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt.
Latimore, 378 Mass, at 677-78, quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979); see Torres and Commonwealth v. Doucette, 408 Mass. 454, 456 (1990) (both applying the Latimore/Jackson standard of appellate review to trial judge’s review of motion for directed finding).
As noted above, in the discussion of the facts, Trooper Alvino’s testimony placed the defendant’s truck on the sidewalk, out of her lane of travel and in the path of an oncoming cyclist, with no apparent explanation to be found in road, traffic, weather, or lighting conditions. This was sufficient to convict for operating to endanger. See, e.g., Commonwealth v. Siciliano, 420 Mass. 303, 307-08 (1995) (“evidence that the defendant drove while intoxicated, made a wide turn, crossed into the opposite traffic lane, swerved back and forth across the roadway, and nearly struck a traffic island” was sufficient); Commonwealth v. Bergeron, 398 Mass. 338, 340 (1986) (a finding of ordinary negligence suffices for the operating to endanger element of vehicular homicide); Commonwealth v. Vartanian, 251 Mass. 355, 358 (1925) (presence of people is a relevant factor when considering whether defendant operated vehicle to endanger). Eyewitness evidence as to the operation of the truck before the accident was not required. See, e.g., Commonwealth v. Gordon, 389 Mass. 351, 358 (1983).
The evidence concerning operating under the influence presented a closer case, but still one presentable *146 to the jury. To succeed on this element, the Commonwealth was required to prove beyond a reasonable doubt that one or more of the scheduled medications, through its effect on the defendant’s “judgment, alertness, and ability to respond promptly and effectively to unexpected emergencies,” diminished her “ability to operate a motor vehicle safely.”[10] Commonwealth v. Connolly, 394 Mass. 169, 174 (1985). A scheduled medication need not have been the sole or exclusive cause of the defendant’s diminished ability to drive safely, so long as is was a contributor. “It is enough if the defendant’s capacity to operate a motor vehicle is diminished because of [a substance listed in the statute], even though other, concurrent causes contribute to that diminished capacity.” Commonwealth v. Stathopoulos, 401 Mass. 453, 457 (1988).
From the evidence summarized above, the jury could have concluded:
1. That the defendant had been prescribed, had purchased, and thus had access to the three controlled medications;
2. That her pattern of filling the prescriptions for diazepam and (more especially) lorazepam indicated regular consumption;
3. That the recency of her filling prescriptions for oxycodone (August 29, 2001) and lorazepam (August 31, 2001) — particularly when combined with the indications that she may have suffered very recently from dry socket (an indication for oxycodone) and, on the night of August 31, from insomnia (an indication for lorazepam) — indicated recent enough consumption to have affected her on September 1;
4. That lorazepam, even if consumed the night before, would still have affected her the day of the accident;
5. That the steadily diminishing list of medications given by the plaintiff following the accident — and the omission of the three controlled medications in her statements to the police — indicated a consciousness of guilt, further bolstering the other circumstantial evidence of intoxication;
6. That the evidence of the defendant’s erratic and dangerous driving, on two occasions[11] separate but close in time and location, and the lack of any reasonable explanation for either, was evidence of impairment due to intoxication;
7. That the fact that the defendant was under the influence of prescription medications, rather than alcohol or a common drug of abuse, made it difficult for most of the witnesses who evaluated the defendant’s affect after the accident to detect impairment;
8. That the description of the defendant’s affect by Officer Hatch, who had known her for most of her life, was consistent with the sedating effects of all three controlled medications; and
9.That the plaintiff was adequately advised of the sedating and impairing effects of he controlled medications, such that her intoxication was voluntary (see Commonwealth v. Darch, 54 Mass.App.Ct. 713 (2002), and Commonwealth v. Wallace, 14 Mass.App.Ct. 358, 360 (1982)).
As noted above, the case lacked direct evidence that the defendant had taken any of the controlled medications recently enough to be impaired by them, and it lacked direct evidence of what concentrations she had of any of them. Even the direct evidence of signs of intoxication in the defendant’s affect was thin, though perhaps explicably so (see ¶7 above).
From the evidence that was presented, however, the jury had enough to conclude that the defendant had access to the drugs; that she had taken oxycodone recently and lorazepam both recently and regularly; that she appreciated the dangers of the controlled medications, both medically and (by the time she spoke to the police) legally as well; and that her erratic and dangerous driving on the day of the accident lacked any reasonable explanation other than impairment by one or both of these drugs. This was enough to convict.
The question of guilt cannot be left to conjecture or surmise... However, circumstantial evidence is competent to establish guilt beyond a reasonable doubt. An inference drawn from circumstantial evidence “need only be reasonable and possible; it need not be necessary or inescapable.” Moreover, the evidence and the permissible inferences therefrom need only be sufficient to persuade “minds of ordinary intelligence and sagacity” of the defendant’s guilt. Fact finders are not “required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in the light of their experience as to the natural inclinations of human beings." To the extent that conflicting inferences are possible from the evidence, it is for the fact finder to resolve the conflict.
Commonwealth v. Gilbert, 423 Mass. 863, 868 (1996) (citations omitted).
B. Motion to Reduce Verdict.
Rule 25(b)(2) of the Rules of Criminal Procedure provides as follows:
Motion After Discharge of Jury. If the motion (for a required finding of not guilty] is denied and the case is submitted to the jury, the motion may be renewed within five days after the jury is discharged and may include in the alternative a motion for a new trial. If a verdict of guilty is returned, the judge may on motion set aside the verdict and order a new trial, or order the entry of a finding of not guilty, or order the entry of a finding of guilty of any offense included in the offense charged in the indictment or complaint.
The Rule incorporates the statutory authority conferred by G.L.c. 278, §11.
*147 In a recent (and celebrated) discussion of this authority, the SJC noted,
The authority of the trial judge under rule 25(b)(2) to reduce the verdict or grant a new trial in criminal cases is much like our authority to review so-called capital cases — convictions of murder in the first degree — under G.L.c. 278, §33E.
The postconviction powers granted by the Legislature to the courts at both trial and appellate levels reflect the evolution of legislative policy promoting judicial responsibility to ensure that the result in every criminal case is consonant with justice. It is clear that the responsibility may be exercised by the trial judge, even if the evidence warrants the jury’s verdict. “[A] new trial or verdict reduction may be proper even when the evidence can legally support the jury’s verdict.” The judge’s option to reduce a verdict offers a means to rectify a disproportionate verdict, among other reasons, short of granting a new trial. The judge’s power under rule 25(b)(2), like our power under G.L.c. 278, §33E, may be used to ameliorate injustice caused by the Commonwealth, defense counsel, the jury, the judge’s own error, or . . . the interaction of several causes.
Commonwealth v. Woodward, 427 Mass. 659, 666-67 (1998).
As the trial judge in Woodward put it, a judge’s exercise of the Rule’s authority to reduce a verdict is less constrained than when considering a motion to set aside a verdict as unsupported by the evidence:
The test here is no longer narrowly legal. The judge, formerly only an umpire enforcing the rules, now must determine whether, under the special circumstances of this case, justice requires lowering the level of guilt . . . The facts, as well as the law, are open to consideration.
Commonwealth v. Woodward, 7 Mass. L. Rptr. 449, 1997 WL 694119 (Mass.Super., Zobel, J.).
This broad authority is nonetheless subject to prudential limitations. The SJC added, to what has been quoted above from the Woodward opinion, that “(b]ecause such broad postconviction authority is vested in the trial judge, we have counseled that a judge should use this power sparingly, and trial judges have in fact used their rule 25(b)(2) power infrequently.” Id. at 667, citing Commonwealth v. Keough 385 Mass. 314, 321 (1982) (trial judge “should not sit as a ‘second jury ”); see also Commonwealth v. Carter, 423 Mass. 506, 512 (1996) (judge hearing motion to reduce verdict “is not to play the role of thirteenth juror” or to “second guess the jury”). Perhaps not surprisingly, it appears that the verdict-reduction power is exercised most frequently — as in Woodward — to walk the “fine line[s]” between the forms of malice required for the various degrees of homicide.[12] 427 Mass, at 669.
The defendant offers two reasons for a reduction of the verdict in this case, from felony to misdemeanor vehicular homicide (i.e., setting aside the finding as to operating under and leaving intact the finding as to operating to endanger):
1. The lack of any direct evidence, or of overwhelmingly compelling circumstantial evidence, that the defendant ingested any of the controlled medications during a relevant time period; or that she exhibited signs of intoxication on the day of the accident; or that her driving ability was actually impaired; and
2. The lack of any evidence whatsoever that the defendant abused any of the controlled medications, or otherwise failed to take them as prescribed (which the defendant frames, in part, as an argument for “involuntary intoxication”).
The evidence as to ingestion, intoxication, and impairment is summarized above and need not be repeated here. It was, as the defendant characterizes it, “slim,” at least in the sense that there was no single piece of evidence of which one could say that if accepted as true, it virtually compelled a finding of intoxication by a controlled medication.
That said, there was a good deal of circumstantial evidence which, taken in its entirely, is difficult to discount. Perhaps the strongest single piece of evidence came, not from medicine or from pharmacology, but from physics and accident reconstruction. If one accepts the conclusion of Trooper Alvino that the truck was on the sidewalk at the promt of impact — which the juiy were not required but were entitled to do — there might be a variety of explanations for it, but the only one to be found anywhere in the evidence is that of intoxication. If one also accepts the testimony of Krusen and Curcio (including the identification furnished by the latter) — as the jury were also entitled to do — this showed a chain of events of some duration, likewise consistent with intoxication and begging alternative explanation in the evidence. A loose sandal might explain the Krusen-Curcio incident alone — though even this is undercut by the defendant’s disclaimer of any problem resulting from it — but it does little to explain a course of reckless driving, which endangered two lives and took a third, and which persisted or was repeated over the course of several minutes and several miles. When combined with evidence of the defendant’s access to, her apparent pattern of using, and the likely effects of the controlled medications, and with Officer Hatch’s description of her affect after the accident, the conclusion which the juiy drew, beyond a reasonable doubt, was a reasoned and rational one.
As noted above, the verdict-reduction power conferred by G.L.c. 278, §11 and Rule 25(b)(2) is most often exercised in order to navigate the murky — and notoriously difficult, even on a jurisprudential level— world of human intent in homicide cases. These are cases in which the law, for reasons of social utility and fairness, requires a juiy’s pronouncement upon what many would argue is inherently unknowable. Some room for reflection and correction is necessaiy, in all cases but especially in these.
*148 In this case, however, the central issue — whether or not the defendant’s ability to perform a complex task such as driving was impaired by a controlled medication — was an ascertainable fact. Its determination on the evidence presented in this case was not a simple or an easy task, to be sure, but there is no reason to suppose that it was beyond the ability of the jury. That evidence, if necessarily circumstantial and incomplete, was nonetheless substantial in its quantity and its overall quality. Trial presentations for both sides were excellent. I do not think the jury’s verdict represented a miscarriage of justice.
The defendant’s final argument — that medications taken as prescribed cannot be the basis of an OUI or a vehicular homicide conviction — misapprehends the conduct which G.L.c. 90, §§24 and 24G make criminal. Her argument to the contrary notwithstanding, neither the statutes, nor the conviction in this case, criminalizes the defendant’s mental illness, or her therapy. The offense is operating under the influence. What is forbidden is not taking medications as prescribed; it is getting behind the wheel of a motor vehicle while impaired, whether by these or by other, enumerated substances.
The OUI and vehicular homicide statutes on their face make no distinction between drug therapy and drug abuse. They instead require proof that the defendant operated a motor vehicle; that a listed substance impaired her ability to do so safely (for operating under), and that she thereby caused the death of another person (for vehicular homicide). Impairment by a prescription drug may be as dangerous as impairment by alcohol or a drug of abuse (which for some drugs is precisely the reason a prescription is required). The statute aims to keep the impaired driver off the road in either case. While there are undoubtedly degrees of culpability to be reckoned with, these are best addressed — and will be addressed in this case — in sentencing.
ORDER
For the foregoing reasons, the defendant’s Motion for Relief Pursuant to Mass.R.Crim.P. 25(b)(2) is DENIED. The date for sentencing remains November 5, 2003 at 3:00 p.m., in Lowell.

 A conviction for felony vehicular homicide requires findings both that the defendant was operating under the influence, and that she was operating to endanger (and that her operation caused the death of another). Misdemeanor vehicular homicide requires a finding either of operating under or operating to endanger, resulting in death. Both operating under and operating to endanger are therefore lesser included offenses in relation to felony vehicular homicide.

 The week that trial began I held an evidentiary hearing, over two mornings, concerning the admissibility under Commonwealth v. Lanigan, 419 Mass. 54 (1994), of Trooper Alvino’s testimony. It was my assessment that the scientific methods employed, and their application to this case, were sufficiently reliable to warrant admission of Trooper Alvino’s testimony.

 With respect to diazepam and lorazepam I took judicial notice (and so advised the jury), at the Commonwealth’s request, that these are “depressants,” because they appear on the attorney general’s list of controlled substances, incorporated by reference into c. 94C, §1 and thereby into c. 90, §§24(a) and 24G(a). Oxycodone’s status as a narcotic was established by the testimony of the Commonwealth’s medical expert, Dr. Brower.

 Dr. Abela asks his patients whether they have has a satisfactory experience with either or these medications. Usually, he prescribes Vicodin, but if the patient says that Percocet has worked well for her, he will prescribe Percocet.

 She also stated that her dosages had been increased while she was in the hospital, and that this at first caused her to feel “out of it” and to sleep a lot, but that “now they have no effect on me, and I’m fine." In testimony that I excluded (after first asking if the defendant wished to waive the privilege which she had successfully asserted to exclude all prescribing information and warnings given by her psychotherapists, and being advised that she did not), she added that “the doctor said that it was completely fine for me to be driving on them, because I asked him yesterday . . . and he said it was fine. He said they have no effect on your driving.”

 Dr. Balser and the police witnesses were in agreement that the decision whether or not to test for intoxication is a medical one, made by the physician and not under the direction of law enforcement.

 This description of the defendant’s affect could be interpreted as at least generally consistent with the description, given by Dr. Brower, of the calming and sedating effects of lorazepam and diazepam. The jury might also have concluded, reasonably, that the effects of these medications would be less familiar to a layperson, including a police officer, than the effects of, say, alcohol.

 Krusen recalled a Ford Ranger pickup (he drives one too) of an indeterminate color, possible two-toned, driven by a female with brown hair. Curcio remembered a small pickup whose color was unusual, unfamiliar to him, and difficult to describe beyond a “very dark green with something mixed in”; the driver was a female, in her late teens or early 20s, with shoulder-length brown hair and looking “intense.”

 The jurors were instructed that the charges against the defendant all pertained to the accident with Evan Holofcener, not to the incident involving Krusen and Curcio.

 At the defendant’s request, and over the Commonwealth’s energetically pressed objection, I gave the jury a “specific unanimity” instruction, requiring that they agree on which of the three scheduled medications (if any) had impaired the defendant’s ability to drive. “[W]hen the Commonwealth introduces at trial evidence of alternate incidents that could support the charge against the defendant, the jury must unanimously agree on which specific act constitutes the offense charged.” Commonwealth v. Kirkpatrick, 423 Mass. 436, 442 (1996), cert denied, 519 U.S. 1015 (1996). Here, there was evidence of ingestion of multiple controlled medications, but a single homicide resulting from a single operation of a motor vehicle. Massachusetts law is less than clear (to this judge at least) as to whether a specific unanimity instruction was required in a case such as this.

 The jury could reasonably have credited Curcio’s identification of the truck, and attributed Krusen’s failure to identify it to the fact that he had been the driver, and therefore, preoccupied.

 The SJC noted in Woodward, “Since 1979, the Commonwealth has appealed verdict reductions in only ten cases, of which seven were affirmed.” 427 Mass, at 667. Eight of these cases (cited in note 12 to that opinion) were homicides; the other two were drug cases, in which trafficking convictions were reduced to possession with intent to distribute.